BERKEY PHOTO, INC., Plaintiff,

v.

EASTMAN KODAK COMPANY,
Defendant.

No. 73 Civ. 424(MEF).

United States District Court,
S. D. New York.

Memorandum on Post-Trial Motions
June 16, 1978.

On Motions for New Trial and for
Reargument of Motion for Judgment
N.O.V. Aug. 8, 1978.

Parker, Chapin, Flattau & Klimpl, New York City, for plaintiff; Alvin M. Stein, Barry J. Brett, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant; William Piel, Jr., John L. Warden, Richard E. Carlton, New York City, of counsel.

## MEMORANDUM ON POST–TRIAL MOTIONS

FRANKEL, District Judge.

Defendant has moved under F.R.Civ.P. 50(b) for judgment notwithstanding the jury's verdicts. Plaintiff has moved for numerous and detailed kinds of injunctive relief, including some divestitures, provisions for predisclosure, and various restrictions on Kodak's business procedures and practices. It is convenient to treat both motions together and to record some pertinent observations on both in this single memorandum.

### I. DEFENDANT'S MOTION FOR JUDGMENT N.O.V.[1]

Many of the issues canvassed in the briefs on this motion were considered at length during the trial, in conversations on the record, and the resolutions reached by the court are largely reflected in the charges to the jury. It does not seem useful for *nisi prius* purposes to rehearse all the problems again in this writing. Nor is it necessary to discuss the legal standard, not in dispute, for granting judgment notwithstanding the verdict. See *National Auto Brokers Corp. v. General Motors Corp.*, 572 F.2d 953, at 956 (2d Cir. 1978). Accordingly, as to the portions of defendant's motion which are being denied, the court will limit its observations herein to a relatively few matters

of possible further interest. On the claims with respect to which the motion is being granted, the result of which will be to reduce the total award from $37,620,130 to $27,154,700, the court will of course state the reasons why the jury's verdict is found now to be vulnerable to this extent.

### 110 Cameras

The largest single item of damages awarded by the jury was for Berkey's lost profits, $15,250,000, resulting from Kodak's unlawful monopolization and attempt to monopolize the amateur camera market. The predominant part of the evidence supporting this claim dealt with the introduction of the 110 camera line as part of a system of interdependent photographic products, without prior disclosure to competing camera manufacturers of the information about the new Kodacolor II film format that would have enabled these other manufacturers to enter the market at about the same time as, and compete on the merits with, Kodak's initial line of 110 cameras.

For the most part, defendant's contentions on this score, as it observes, retrace ground plowed earlier in denying defendant's motion for summary judgment and formulating the charge to the jury. This reflects a superficially bemusing situation: that despite the length of the trial, the basic historical facts on this, as on many aspects of the case, are not in significant dispute. Without recounting these facts in detail, we may note that the jury undoubtedly found that defendant resolved some years before the 110 introduction to introduce the new camera and film, made to work with each other, and designed to displace with overwhelming suddenness huge segments of the market for 126 cameras. Defendant's responsible executives determined that the simultaneity of these introductions was to be the key weapon against competitors, brushing aside technical objections that the new film was unsatisfactory,

---

1. Plaintiff tenders the stunning suggestion that Kodak waived the right to make this motion by failing to move for a directed verdict at the end of both trial phases. As reflected, however, by the consultations preparing a briefing schedule for the instant motion, the record amply protects Kodak in this respect.

inferior to the predecessor Kodacolor X in vital respects, and requiring further research and development to become a satisfactory product. The paramount strategy and goal were thus to use the film monopoly—Kodak's power in a field where its market share consistently exceeded 80%—as a lever for suddenly swelling defendant's power in the camera market, achieving there at least a temporary total monopoly of a vital new segment to be created by the system introduction. Some "responsible persons" within Kodak urged unsuccessfully that predisclosure concerning the new film format be given to camera competitors (as well as photofinishers and photofinishing equipment makers) so that they would not suffer in one blow the instant obsolescence of inventories and work in progress and the inability to compete at all with their cameras in the terrain of the newly announced system. The 110 announcement came substantially as a surprise, following some minimal predisclosures, for a price, two or three months earlier. And these events, it is worth mentioning, followed hard after a magicube coup in June of 1970, when Kodak gained a similar advantage of surprise and temporary exclusivity from what the jury found, and the court entirely agrees, was an unlawful combination in restraint of trade with Sylvania.

Without dwelling further on the facts of a huge record leading to the jury's award, the court refers briefly to some recurrent arguments defendant has pressed on this subject and sketches the reasons why they have been, and are once again, rejected.

### 1. The claim of immunity per se for product introductions

■ Throughout the case, defendant has urged, and it urges once more, that a company's introduction of a new product—though the company be a huge one like Kodak with monopoly power in a mosaic of interconnected markets, and though the introduction be designed deliberately to employ monopoly power in one market to create or enhance such power in another—must "as a matter of law" be immune from attack under the antitrust laws. If this is sound law, defendant should indeed be relieved of the verdict with respect to 110 camera damages. The court remains persuaded, however, that there is no such enclave for "product introductions," and that the mode, purpose, and impact of product introductions may, as in this case, play central parts in findings of unlawful monopolization and attempts to monopolize, no less than other, ordinarily lawful and "normal" business activities like leasing rather than selling machinery, *United States v. United Shoe Machinery Co.*, 110 F.Supp. 295, 344 (D.Mass.1953), aff'd per curiam 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), the creation of useful resources for added productive capacity, *United States v. Aluminum Co. of America*, 148 F.2d 416, 430–31 (2d Cir. 1945), or the discount offered on used equipment and the adoption of separate charges for separate services condemned as exclusionary in *Greyhound Computer Corp. v. International Business Machines Corp.*, 559 F.2d 488, 499–503 (9th Cir. 1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978).

Before *United Shoe* and *Alcoa*, arguments similar to Kodak's could have been mounted with respect to the practices of defendants there involved—leasing, building capacity, etc. Indeed, they were made. Thus, in the *United Shoe* case, seeking reversal of Judge Wyzanski's historic ruling, the appellant company accepted the restrictions the *Alcoa* case had placed upon it as a dominant firm but assailed bitterly the notion that leasing of machinery could be the basis for a judgment against it. United Shoe complained of being condemned for its decision merely "to continue a business policy which it found in existence at its birth." [2] It noted that this was "the policy of its more important American competitors," [3]

---

**2.** Brief for Appellant at 90, *United Shoe Machinery Corp. v. United States*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954) (per curiam).

**3.** Id.

that it was among United's familiar practices "which are traditional, natural and normal,"[4] and that allowing such practices to be outlawed after years of use would subject every dominant company to the threat of unpredictable, retrospective, destructive judgments by judges and juries.[5] That plea was unavailing; leasing practices were held subject to scrutiny and capable of being proscribed in a proper case as exclusionary techniques in the hands of a company with monopoly power. Kodak accepts that, as it must, but would draw the line now at product introductions. To reject that position does not mean, of course, that Kodak's product innovation techniques are *ipso facto* to be denounced. It means merely that they were open to informed inspection in this case, in the setting of all the circumstances of Kodak's power and practices, and that the jury could well have found (as the court would have found) anticompetitive uses by Kodak of its monopoly power in the manner and timing of its product system introductions.

■ There are few mechanical rules to take the place of informed judgment in the enforcement of the antitrust laws. While *per se* rules *of liability* are useful and comfortable where they exist, the task usually is to weigh "all of the circumstances of a case" to determine whether a company has engaged in unlawfully anticompetitive practices. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). The ultimate judgment, as in the cited case, must commonly rest "upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Id.* at 59, 97 S.Ct. at 2562. So, here, the jury was commissioned

and instructed to appraise all the facts and circumstances and decide whether the manner, timing, and effects of the 110 introduction amounted to the anticompetitive employment of monopoly power not merely "to gain a competitive advantage," *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), but to attempt unlawfully to monopolize, and to monopolize, another market. The court is compelled to conclude that the record and the law wholly justified the verdict in this aspect against Kodak.

Under the law, generally speaking, the inquiry required appraisal of all Kodak's relevant behavior to determine whether that behavior should be accepted as no more than

"the use of accessible resources, the process of invention and innovation, and the employment of those techniques of employment, financing, production, and distribution, which a competitive society must foster,"

*United Shoe, supra*, 110 F.Supp. at 344, or whether Berkey had shown by a preponderance of the evidence that Kodak had proceeded by

"contracts, arrangements, and policies which, instead of encouraging competition based on pure merit, further[ed] the dominance of a particular firm."

*Id.* at 344–45. In other words, the jury was required to appraise whether Kodak's conduct represented what Judge Learned Hand labeled "exclusionary" practices. *Alcoa, supra*, 148 F.2d at 431. The charge to the jury was framed to define the inquiry along the lines of the important *Alcoa* and *United Shoe* precedents.[6]

4. Id.

5. See id. at 101 *et seq.*

6. "In order to sustain the charge of unlawful monopolization, Berkey must have established by a preponderance of the evidence three essential elements: (1) that Kodak at relevant times possessed monopoly power in a relevant market; (2) that Kodak acquired this power or maintained it by exclusionary or anticompetitive means or used it for exclusionary or anticompetitive purposes; and (3) that Berkey suf-

fered injury in its business as a result of Kodak's monopoly power and exclusionary or anticompetitive conduct."
(Tr. 16333).
"You must draw a distinction here between practices which tend to exclude or restrict competition on the one hand, and the success of a business which reflects only a superior product, a well run business, or luck, on the other."
(Tr. 16367).

Beyond that, the case came into a sharper, more specific focus, so to speak, because the evidence tended powerfully to support plaintiff's theory of unlawful "leveraging." It is unnecessary to speculate whether plaintiff might have been entitled to a directed verdict on this score. It is sufficient to say that the evidence showed a carefully orchestrated program by defendant to use its film monopoly so as to obstruct and frustrate competition on the merits in the camera market. The 110 introduction was timed and arranged so that when the new film format appeared, no other camera manufacturer would be in a position to offer the consumer a camera other than Kodak's for use with that film. Kodak was to be, and in the event was, alone in the field, with its competitors paralyzed and consumers deprived of choice. · This may not be, as Kodak stresses, an exact duplicate of *United States v. Griffith, supra.* But it seems to this court to fall squarely within the principles of that authority. Other precedents are to similar effect. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 377, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 713 (7th Cir. 1977). And plaintiff

is on the mark, in this court's view, in invoking the tie-in cases as cognate authority, to accentuate the fundamental animus of the antitrust law against the "use of economic power in one market to restrict competition on the merits in another regardless of the source from which the power is derived . . . ." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 11, 78 S.Ct. 514, 521, 2 L.Ed.2d 545 (1958).

It does not advance the inquiry, but only begs the question, to protest, as defendant has throughout, that product introductions involve "necessary commercial decisions," "natural advantages," or "normal and lawful business practice." [7] The contentions so phrased assume facts contrary to what the jury could, and probably did, find. The charge left the jury to decide whether such characterizations fairly described what Kodak had done. The verdict implies, and the court would have given, a negative answer.

Defendant is not helped by protesting that under the law applied in this case "all product announcements by companies with large market positions are at risk without any legal standards to guide the businessman as to when and how and under what

"The kind of conduct which concerns us here is conduct which unnecessarily excludes or handicaps competitors. This is conduct which does not benefit consumers by making a better product or services available, or in other ways, and instead has the effect of impairing competition. To sum up, your task is to determine whether Kodak gained, maintained, or used monopoly power in a relevant market by arrangements and policies which instead of encouraging competition, were designed primarily to further Kodak's domination of the market." (Tr. 16367–68).

"It can sometimes be difficult to determine the primary quality or nature of an act so as to classify it as either honestly industrial or as exclusionary or anticompetitive. Nevertheless you must be the judge. Given conduct may both help customers and hurt competitors. If this seems to be the case to you, you must ask yourselves whether it hurts competitors precisely because it appeals to consumers. That is, was the harm to competitors caused by customers' preference for the defendant's products? If so, the kind of conduct involved is not exclusionary or anticompetitive because the goal of Section 2 is to protect competition itself rather than a particular competitor's right to thrive. If a business does poorly because it is

faced with vigorous competition, this is not unlawful. However, if the harm to competitors is caused by something other than the defendant's success in competing on the merits of its products and operations—if the harm is caused primarily or substantially by the defendant's deliberate efforts to injure or block competition—then you may find that the conduct was anticompetitive." (Tr. 16368–69).

"There is no law that makes it illegal to introduce products which are physically dependent on each other, at least under ordinary circumstances. However, if you find Kodak possessed monopoly power in film or in cameras, and if you conclude based on all the evidence that in either instance the decision to introduce products in the form of a system was primarily dictated neither by technological necessity nor by a desire to serve the needs of customers, you may find that Kodak engaged in exclusionary conduct in the camera market, the film market or markets, the color print paper market or all of these." (Tr. 16383).

7. Memorandum in Support of Motions 6, 26, 21.

circumstances to bring out new products to market." [8] It is at least a little demure for defendant to describe itself as a mere company with a "large market position." . Kodak is, as the jury found and its counsel early observed, a "giant," with a nearly unique agglomeration of enormous powers over adjoining markets in a huge industry. Thus, the problem does not arise here in a way that ought to be of desperate concern to some uncertain class of "companies with large market positions. . . ." Overlooking that it has been found on compelling evidence to be a monopolist in an array of markets, Kodak also overlooks that monopolies are not darlings of the antitrust laws. Whatever supposed uncertainties inhere in the standards applied in this case— and it must be conceded surely that there are some—these standards would appear to be, if anything, more lenient toward Kodak than the stringent rule of *Alcoa*, allowing a monopolist to avoid illegality only if it could show that the disfavored position of power had been "thrust upon" it as a result of its superior business acumen or skill in the relevant market. Far from approaching a showing to satisfy that standard, the evidence reveals a monopolist in one market (film) engineering that power to thrust itself into a monopoly position in a second market (cameras). The result was a world away from being "economically inevitable," *United Shoe*, 110 F.Supp. at 345; it was plainly avoidable, and the means Kodak chose to employ were plainly to be shunned.

Kodak's complaint at root is that it faces liability for conduct which other business firms, lacking monopoly power, engage in regularly with impunity. Even if the factual premise were to be credited, the short answer is that the antitrust laws do not permit willful maintenance of monopoly power by conduct that might for a company without such power be deemed "honestly industrial." *Alcoa, supra,* 148 F.2d at 431; *United Shoe, supra,* 110 F.Supp. at 344. The present case illustrates the now settled rule that "[t]here are kinds of acts which would be lawful in the absence of monopoly but, because of their tendency to foreclose competitors from access to markets or customers or some other inherently anticompetitive tendency, are unlawful under § 2 if done by a monopolist . . . ." *Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 711–12 (7th Cir. 1977).

### 2. *Predisclosure*

Plaintiff's theory on the camera monopoly claim included the contention that if defendant had given them advance information about the size and other pertinent qualities of the new Kodakcolor II film, other camera manufacturers, including plaintiff, could have geared up to be ready to compete on the merits with Kodak in offering cameras suitable for use with the new film. Treating this aspect of the claim, the court cautioned the jury that a company normally has a perfect right to keep its secrets, winning competitive advantages by launching new and better products in its own way and in its own time. Undertaking, however, to apply the teachings of the authorities on section 2 of the Sherman Act, the court went on to instruct that Kodak's monopoly power in film, if it was found to disable competitors who could not offer cameras comparable to Kodak's, might lead the judges of the facts to decide that the failure to give camera makers the necessary predisclosure concerning film should in all the circumstances be deemed anticompetitive.[9] These instructions ap-

---

8. Memorandum in Support of Motion 6.

9. "Standing alone, the fact that Kodak did not give advance warning of its new products to competitors would not entitle you to find that this conduct was exclusionary. Ordinarily a manufacturer has no duty to predisclose its new products in this fashion. It is an ordinary and acceptable business practice to keep one's new developments a secret. However, if you find that Kodak had monopoly power in cam-

eras or in film, and if you find that this power was so great as to make it impossible for a competitor to compete with Kodak in the camera market unless it could offer products similar to Kodak's, you may decide whether in the light of other conduct you determine to be anticompetitive, Kodak's failure to predisclose was on balance an exclusionary course of conduct." (Tr. 16392).

plied to a record on which the jury could readily have found among other things: (1) that Kodak timed the 110 system to cope with the inroads its competition was making in the 126 camera market, not as a result of the pace of design evolution; (2) that the simultaneous offering of a new color print film was a use of the film monopoly to gain a competitive jump, not a genuine improvement or benefit to consumers; (3) that the anticompetitive purpose and effect of the introduction could be inferred from evidence that the new products were inferior in important respects, including, notably, the "red eye" problems, which Kodak took pains to conceal, beginning with the carefully planned lighting arrangements at the gala press conference called to launch the new system; and (4) that the highly publicized new Kodacolor II was restricted for a critical interval of time to the 110 format, for which only Kodak could supply cameras, for that anticompetitive purpose alone, not because of any technological or legitimately commercial concerns counseling this timetable.

Without disputing the foregoing facts and others from which the jury could have found the 110 introduction a scheme contrived almost wholly to crush competitors, and scarcely or not at all to compete by serving consumers better, defendant preserves its position that failure to predisclose could not as a matter of law go before the jury as a possibly material factor. The argument, characteristically robust and uncompromising, is that "the law," according to Kodak, "leaves to Kodak, acting in its own commercial interest, the decision when and how to bring its products to market."[10]

▆ That extends the line Kodak has sought to have drawn throughout the case. The court adheres to the view that defendant is in error.[11] Again, the court perceives

the principles of the Sherman Act and the pertinent precedents as demanding a frequently subtle, inevitably comprehensive appraisal of actions by a company like Kodak wielding enormous monopoly power. Given such power, we were reminded not long ago, it becomes an essential question whether the evidence shows "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Here, then, plaintiff was entitled to have the triers of fact consider whether, in the total setting portrayed by a long record, an inference of "willful acquisition or maintenance" might be promoted or strengthened by the deliberate decision to keep secret the plan to use the combination of monopoly powers so that camera makers would be blocked for a substantial time from competing at all for the custom of amateurs who would want the "remarkable new" Kodacolor II film and would be forced to deal with Kodak alone as the purveyor of "the film that was made for the camera that was made for the film."

3. *Business decisions and product quality*

[5] On legal reasoning essentially like that affecting predisclosure, the court continues to reject defendant's thesis that the jury should not have been permitted to appraise "business judgments" as to whether a new product is adequate and when to introduce it. As we approach the Sherman Act's centennial, it seems extraordinary to suggest that conduct questioned under that broad enactment may be shielded from scrutiny because it results from "business judgments." This was not so for the decision to lease rather than sell in *United Shoe* or for the countless business decisions that

---

10. Memorandum in Support of Motion 7.

11. The claim that the existence of rights secured to innovators under patent and trade secret laws mandates a different result is not persuasive. Far from creating a total screen against the application of the antitrust laws, the rules on patents and trade secrets allow a

limited exception to a general rule against monopoly. *Transparent-Wrap Machinery Corp. v. Stokes & Smith Co.*, 329 U.S. 637, 640–41, 67 S.Ct. 610, 91 L.Ed. 563 (1947); *Precision Instrument Manufacturing Co. v. Automatic Maintenance Machinery Co.*, 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

have been evaluated, whether to condemn or absolve, in antitrust cases. It seems equally clear that there is no legal shield covering questions of product quality. Turning no farther back than the quotation just above from *Grinnell*, we see it was a material question in the present case, as in others, whether Kodak's accession of increased monopoly power through the 110 system could be attributed to a "superior product." The jury was properly permitted, the court reaffirms, if not required, to appraise the 110 system for this purpose: to think whether the new film was somehow superior, and to evaluate in that light the new camera as well—whether *it* was "superior," or whether, perhaps, the ultimately decisive thing about the camera was its being designed to be protected in the market from any direct comparisons or competition of any kind.

The jury was cautioned at some length that it did not sit to second-guess business judgments as such, and that the quality of Kodak's products was not a concern in the case for its own sake.[12] The only question

in this quarter given to the triers of fact was the possibly difficult, but seemingly appropriate one of determining if the relative character of the products in question might cast light on whether the securing of monopoly power in the camera market was a natural and innocent business development or the kind of willful acquisition condemned by *Grinnell* and other cases.

### 4. *Intent*

■ The final quarrel to be mentioned in connection with the 110 camera award is that it was error to allow the jury to consider evidence of Kodak's intent as reflected in statements of its responsible people. In treating this matter, the court recalls the sharply limited extent and purpose for which the jury was permitted to examine intent, if it reached this subject at all. Under the court's charge, evidence of this nature was to be scrutinized only if it was not feasible otherwise to decide whether particular conduct on Kodak's part should be deemed "either honestly industrial or anticompetitive."[13]

---

12. "Kodak had no obligation under the antitrust laws to see that a new product was superior to the old. That question of quality, *in and of itself*, is not in issue here. Berkey's thesis in this respect is that the new products were introduced so as to unbalance competition—obsoleting prior systems such as the 126, and postponing competitors' chances to compete for the sale of the new systems, rather than to give consumers something genuinely better. The attempt to show that a new product such as Kodacolor II was not an improvement over existing products is made as a part of the effort to prove this claim. Of course, it is for you the jury to decide along the way whether the evidence shows that the new products were inferior, superior, or essentially comparable. But remember that this is not an ultimate question for its own sake. The ultimate question to which it goes is whether the new product introductions were primarily a form of honestly industrial competition, designed to produce something more attractive for the customer, or primarily exclusionary and anticompetitive in the sense of these terms which is now familiar to you." (Tr. 16389).

13. "In some cases where it is not immediately apparent whether particular conduct which Berkey has complained about is exclusionary, you will be required to determine whether the conduct is primarily an effort to attract cus-

tomers or primarily an effort to undermine competitors. In these situations, you may consider the evidence bearing on Kodak's motivation and objectives to help you ascertain the primary thrust of the conduct in question.

"In these cases the question is not whether Kodak specifically intended to attain the end result of monopoly power. Berkey does not have to prove that in order to establish monopolization. On the other hand, a mere showing that Kodak intended to do the actual things it did may not be sufficient to show whether or not the actions were anticompetitive. The issue may then be whether the primary objective pursued by Kodak management in engaging in the conduct was exclusionary or predominantly customer-oriented.

"Some conduct may speak for itself; that is, it is only capable of being understood in one way, whether this be as exclusionary or as honestly competitive. Other conduct may be harder to evaluate. It is in cases of the latter sort that evidence of purpose or motivation may help you tell whether the conduct was exclusionary.

"Since Kodak is a corporation, rather than a living person, it can only act through its officers and employees. Similarly, it is only these officers and employees who have an intent in the sense in which we ordinarily use the term. Therefore, if you have any doubt as to whether particular conduct is exclusionary in a given

The court finds it difficult on the authorities to comprehend the claimed impropriety of this limited reference to motivation and purpose as a potentially relevant circumstance in determining whether conduct should be held unlawfully restrictive or anticompetitive under the Sherman Act. At least since *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918), as reaffirmed no longer ago than *Continental T.V., Inc., v. GTE Sylvania Inc., supra,* 433 U.S. at 49 n. 15, 97 S.Ct. at 2558, we have been taught in this setting that "knowledge of intent may help the court to interpret facts and to predict consequences." We are to look, or the jury is to look, as noted repeatedly herein, for evidences of "willful acquisition" of monopoly power. And these quotations reflect an elementary premise that pervades the law, criminal and civil—that intent, motive, or purpose is often a prime clue to adequate understanding and characterization of conduct otherwise equivocal. See also *Sargent-Welch Scientific Co., supra,* 567 F.2d at 712.

The limited reference to motive or purpose in this case is entirely consistent with the law that intent need not be proved to establish an unlawful monopoly. *Alcoa, supra,* 148 F.2d at 431–32. It is a primitive logical fallacy to infer from this that "subjective intent" (Kodak's phrase) *may not* be shown to illumine conduct which, apart from purpose and the market power of the party, may appear, in Kodak's contrasting phrase, to have "violated none of the objective precepts of the antitrust laws." [14]

Judge Hand did not hesitate to consult indicia of intent when faced with the need to evaluate equivocal conduct in *Alcoa.* See 148 F.2d at 432–33. That approach, properly understood, leaves ample room for the view, for which defendant cites Professors Areeda and Turner, that a company with monopoly power is not barred from competing, or from intending to do so:

> "There is at least one kind of intent that the proscribed 'specific intent' clearly cannot include: the mere intention to prevail over one's rivals. To declare that intention unlawful would defeat the antitrust goal of encouraging competition on the merits, which is heavily motivated by such an intent." [15]

The court agrees—indeed, with deference, deems it obvious—that "the mere intention to prevail over one's rivals" is "one kind of intent" outside the "specific intent" required to show an attempt to monopolize proscribed by section 2.[16] But the very quotation thus invoked by defendant (referring to "one kind of intent") reminds us that there are other kinds of "intent" that are, or may well be, germane in deciding what conduct is "anticompetitive" (a question arising under section 1 or section 2) and what is the forbidden goal or purpose of an attempt under section 2. The species of *"mere intention"* referred to by Messrs. Areeda and Turner was not permitted to be held wrongful, or the basis for adverse inferences, in the instructions defendant attacks.

Without pursuing further the lesser issues tendered again on this topic, the court

---

relevant market, you may consider the intent of these people in making your decision. However, you may only consider the expressed intentions of an individual Kodak officer or employee as to a subject which was within his area of authority. For example, you would not accept an expression of intention by an ordinary worker on a Kodak assembly line as an authoritative indication of the intent behind Kodak's introduction of the 110 system. When you consider evidence of intent for the purpose of evaluating whether Kodak's conduct was exclusionary, you need not find that the individuals intended to achieve the ultimate result: monopolization. It is enough for you to find that the conduct was intended to exclude or

forestall or injure competition for you to adjudge such ambiguous conduct to be exclusionary. I repeat that if the conduct was clearly exclusionary, or clearly innocent, you need not even consider the intentions of individual officers and employees of Kodak for this purpose." (Tr. 16370–72).

14. Memorandum in Support of Motions 9, 10.

15. P. Areeda & D. Turner, Antitrust Law § 822a, at 314 (1978).

16. It should perhaps be noted, though Kodak tends to slight this, that the jury found an attempt to monopolize the camera market.

records that the verdict for lost profits on 110 cameras will be sustained.

## Kodacolor II photofinishing damages

The jury found, on unquestionably sufficient evidence, that defendant had used its film monopoly—itself unlawfully maintained, as the jury also found—to injure plaintiff as a photofinisher. Under the court's charge, it was essential to this finding that the jury condemned "Kodak's mode of introducing the 110 system without predisclosure to photofinishers . . . [as] exclusionary or anticompetitive conduct unlawfully affecting Berkey and other competing photofinishers . . . ." That determination emerged from circumstances that included a pattern of dealing with photofinishers by which Kodak kept these enterprises relatively small, numerous, dependent upon Kodak, subject to shocks and shifts of their business resulting from sudden changes in Kodak's film operations, and almost inevitably inferior to, and less informed than, Kodak's own Color Print and Processing organization ("CP&P").

Without disputing the factual basis for this finding of liability, and the award of $55,700 in damages for this, defendant argues two grounds of law for setting aside this portion of the verdict:

(1) That the failure to predisclose, notwithstanding the circumstances in which it was shown, could not in law be a basis for liability.

(2) That the finding of illegality cannot stand in the face of the jury's findings that Kodak had neither monopolized nor attempted to monopolize the photofinishing market.

■ The legal issue as to predisclosure, though its factual cast is different, is largely the same in this connection as in the dispute about 110 cameras. Like the camera manufacturers, photofinishers lived under the shadow, and at the mercy, of Kodak's omnipotent film monopoly. Like de-

fendant's camera manufacturing division, its processing organization was secretly informed, and specially prepared, to process the new film promptly after its arrival on the market. Other finishers were left to scramble to catch up; were offered only equipment markedly inferior to CP&P's; [17] continued to be kept ignorant of technical facts and developments needed for maximally effective performance of the finishing service; were barred from competing while CP&P enjoyed a temporary monopoly; and had to watch helplessly as CP&P's reputation for preeminence was enhanced, not only by being first and best informed, but also by being needed for some time to process the other finishers' Kodacolor II orders and by being enabled to employ this opportunity to stuff these competitors' return envelopes to customers with Kodak CP&P advertising literature. Once more, the general proposition that predisclosure of new products is not required is subject to modification, as the jury found, when it is tested by circumstances of market power like Kodak's, capable of paralyzing impacts upon adjoining sectors of the economy.

■ While the subject is not wholly free from doubt, the court also concludes, not only under *United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), but on broader principles of tort and antitrust law, that Kodak could properly be held answerable in damages for the proximate injuries to Berkey in photofinishing despite the decision that Kodak had not monopolized or attempted to monopolize this market. *Griffith,* in explicit language and ultimate implications, denounces use of monopoly power, even when lawfully acquired, nor merely "to beget monopoly," 334 U.S. at 108, 68 S.Ct. 941, but also "to foreclose competition . . . [or] to gain a competitive advantage," *id.* at 107, 68 S.Ct. at 945. Beyond that, it accords with general principles of law that the offense of unlawful monopolization or attempted mo-

---

**17.** There were some light, and illuminating, moments at the trial when a Kodak technician went through a series of fumblings and contretemps attempting to demonstrate in the lighted courtroom a Kodak processing machine sold to independent photofinishers for employment in total darkness.

nopolization should entail liability for proximate consequences. See *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 488–89, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). Cf. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485–89, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); Restatement (Second) of Torts § 431 (1965). Accordingly, the jury's finding that these violations in the film market caused Berkey's photofinishing injuries sustains the award for the latter. And that, finally, is merely a literal and standard application of section 4 of the Clayton Act, 15 U.S.C. § 15, which provides that anyone

> "injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained . . . ."

The photofinishing award will, therefore, be sustained.

### The magicube award

The jury awarded a total of $1,747,330 on Berkey's claims of lost profits in 1970 and 1971 resulting from the joint development program between Kodak and Sylvania culminating in the simultaneous introduction in June 1970 of Sylvania's magicube and Kodak's cameras, unique for at least the time being, constructed to employ the magicube. The award is attacked both on the ground that there could be no liability as a matter of law and on the further ground that the evidence was insufficient to sustain the damage award. The latter contention is sustained to the extent that the court now finds no sufficient evidence on which the jury, answering question 5 on damages, should have been permitted to make its award for the year 1971 in the amount of $1,417,330. The prior award of $330,000 on this branch of the case, for 1970, is left to stand.

As for liability, under both section 1 and section 2 of the Sherman Act, plaintiff defends on several theories. Without reviewing them all, the court notes a central core of scarcely disputed facts upon which the jury must have found, and the court itself would surely have found, a restraint to be denounced under the rule of reason and a form of exclusionary conduct supporting the finding of liability under section 2. It is hardly crucial, though it is much discussed by defendant, whether and to what extent Kodak and Sylvania were potential competitors. The heart of the matter, to summarize very briefly the compelling evidence on this subject, begins with Kodak's commanding position of monopoly power over key components of the amateur photographic industry—the cameras (to use the proposed flash devices), film, and color print paper. It was that dominant position, the jury could have found, that brought Sylvania to Kodak, ready to share its secrets and, under Kodak's pressure, to withhold them from Kodak's competitors in the manufacture of cameras. The jury could scarcely have failed to find, from the documentary and other evidence, that Kodak employed its power to pressure Sylvania and postpone the latter's explicit desire to furnish information concerning the flash device to other camera makers so that they might be less far behind—or, as Kodak effectively meant to avoid, abreast of Kodak—when the race to sell cameras fitted for the magicube began. Sylvania's yearning to be more forthcoming was heightened by its prior flashcube experience and the bitterness of Kodak's competitors when a similar regime of secrecy was enforced with respect to that earlier device. Kodak's insistence was effective. Sylvania's responses to inquiries from equipment manufacturers were carefully limited, thus helping defendant further to entrench its monopoly position by coming forth first, and remaining alone in the field for crucial months, in the sale of magicube cameras.

Adding to this central core of sharply and deliberately restrictive behavior in its combination with Sylvania, Kodak extracted patent rights in Sylvania inventions broader than Sylvania wished to give, and more effective as obstacles to other camera manufacturers.

If there is no exact case in point, there are apt analogies to teach that exclusionary

arrangements in concert may be found unlawful restraints of trade without regard to Kodak's insistent premise that the parties acting in combination must be found to have been in a relationship of "horizontal" competition.[18]

Even if the precedents were less persuasive, it is not good antitrust doctrine to demand cases squarely in point as preconditions for applying the basic principles under a rule of reason. See *Continental T.V., Inc. v. GTE Sylvania Inc.* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).[19] In sum, the court adheres to the premises of the charge to the jury in sustaining the finding of liability for the Sylvania-Kodak secret combination relating to magicubes.

■ As for damages, Berkey should keep its verdict for the latter half of 1970. Delayed until August, and forced to proceed in ruinous haste to be on the market even that early, Berkey offered adequate evidence and a tenable theory to justify the award of $330,000 for that period.

The award for 1971 is another story. Troubled on this score before the jury went to work, the court separated the two periods to enable effective reconsideration at a later time if necessary. Arrived at the later time, the court concludes that this portion of the verdict cannot be sustained.

■ It is doubtful whether and how on this record the jury could have made any measure that is more than speculation in arriving at a supposed amount of damages for any proximate injuries extending into

1971. Plaintiff proposed that the alleged losses for that year could reasonably be assessed by comparing its sales in 1972, when the injurious effects of the magicube introduction were said to have abated, with its sales in 1971. The difference was claimed on summation to represent a fair estimate of the number of additional cameras Berkey would have sold in the earlier year had Keystone been "permitted to get to the starting line with Kodak at the time Sylvania introduced Magicube." (Tr. 18708). The sales figures supplied did indeed reflect dramatic growth in sales, but they embraced *all* of plaintiff's 126 still cameras, including 126 flashcube cameras and the Keystone Everflash, introduced during the last quarter of 1971, which used neither a flashcube nor a magicube but rather an electronic strobe. Plaintiff's evidence showed that its 126 magicube camera sales actually *declined* in 1972 by over 67,000 units, and its flashcube camera sales similarly dropped by almost 25,000. The overall increment in sales recorded in 1972 thus reflected only the increase in sales, over 400%, of Keystone electronic flash cameras, a market success not proved to be in any way related to the overcoming of the adverse impact of the magicube introduction.

The comparison urged therefore could not have measured, even approximately, what it purported to measure. It invited an award of damages measured by the success of Berkey's own innovation, a criterion

---

18. Cf. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Standard Oil Co. of California v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). The cited cases, and numerous others dealing with exclusionary arrangements among non-competitors, demonstrate that such transactions may be barred under section 1 of the Sherman Act, or under the less stringent standards of sections 3 and 7 of the Clayton Act, if they "foreclos[e] the competitors of either party from a segment of the market otherwise open to them . . . .," thereby acting as "a 'clog on competition' . . . which 'deprive[s] rivals of a fair opportunity to compete.'" *Brown Shoe Co. v. United States*,

370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962) (Citations omitted.)

19. "The traditional framework of analysis under § 1 of the Sherman Act is familiar and does not require extended discussion. Section 1 prohibits '[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce.' Since the early years of this century a judicial gloss on this statutory language has established the 'rule of reason' as the prevailing standard of analysis. . . . Under this rule, the factfinder weighs all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." (Footnote omitted.)

which is seen upon reexamination to lack any rational relationship to any wrong for which Kodak may be held liable. In short, the evidence relating to the year 1971 did not afford the jury "evidence furnishing data from which the amount of the probable loss could be ascertained as a matter of reasonable inference." *Eastman Kodak Co. v. Southern Photo Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927). The portion of the verdict based upon it cannot be permitted to stand.

*Film overcharges*

Two substantial contentions by defendant concerning the film overcharge award of $11,500,000 merit attention here. First, defendant says that conceding *arguendo* the evidence showed use of its monopoly power in film to extend its power over *other* markets (cameras, photofinishing, etc.), there was not evidence of anticompetitive conduct to maintain or employ the film monopoly itself, and that this precludes any recovery for allegedly excessive film prices. The court assumes for present purposes that a showing of anticompetitive conduct *affecting the film market* was essential to Berkey's case.[20] Accepting this assumption, Kodak's argument does not prevail.

▮ Defendant correctly describes as a central theme in Berkey's case the attacks on the use of Kodak film power for leverag-

ing in other markets. There was also ample evidence, however, of anticompetitive actions serving to maintain the steadily huge share Kodak enjoyed of the film market. Without exploring, or necessarily accepting, all the kinds of conduct plaintiff would characterize in this way, the court notes two solidly proved items as sufficient. Probably the more important one was the carefully contrived introduction and promotion of the 110 system, already treated in considering the camera monopoly. The record is clear that the purposefully timed, long planned, and pointedly advertised combination of Kodacolor II and the 110 camera, along with appurtenant innovations, had the express purpose and clear effect of buttressing Kodak film sales. This program, commencing before the limitations period in this case, carried forward an earlier, evidently similar scheme involving the 126 system.

The remaining course of conduct to be noted here was the persistent and continued practice of CP&P to offer processing services only for Kodak films. While the CP&P monopoly in color film processing was ended by the consent decree of 1954, this Kodak organization was shown to remain the "prestige" photofinisher. The residual advantages of its extended past monopoly, its special access to the film monopolist's secrets, and its possession of the preeminent name in the industry place it at a strategic

20. The assumption does not seem compelled by any unambiguous authority, nor inevitable on fundamental antitrust conceptions. The law tolerates "lawful" monopolies, but scarcely cherishes them. The drawback in any monopoly is its regrettable exception to the primary value of competitive enterprise. The regret stems from the intertwined evils of monopoly: power to exclude competition and, as its corollary and ultimate mischief, *power to set prices* unrestrained by competitors. *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. E. I. DuPont & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Where a monopolist becomes an unlawful monopolist by engaging in exclusionary or anticompetitive conduct, the injured customer paying the monopolist's price, if it exceeds what a competitive price would be, could argue strongly for a right of recovery whether or not the anticompetitive conduct of the monopolist is "in" the same market or is

"merely" aimed at unlawful results in some related market, as in *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). It would appear not to offend, but rather to buttress, Sherman Act policies to fasten liability upon an unlawful monopoly for achieving the ultimate wrong of charging a monopolist's excessive prices. As appears below, however, it has not seemed necessary to go this far in the instant case with respect to film. Later, with respect to color print paper, the court again eschews that possible extension. There, the finding as to liability as well as damages is held infirm. While one misuse of the power over color paper by leveraging in another market is sustained, this is found insufficient either to hold Kodak liable or to justify exacting of damages for asserted overcharges on the paper. It is not in any event an instance of anticompetitive conduct to acquire or maintain monopoly power *within* the relevant market.

gateway affecting the acceptance and salability of any competitor's, or potential competitor's, amateur film. The network of retailers employing CP&P, and otherwise wedded to Kodak, were surely discouraged from stocking others' films when the esteemed and powerful CP&P organization would not handle it. The urge to compete by effective service and increased sales is so characteristic a pressure in American business that CP&P personnel requested the freedom to process non-Kodak film. Tests conducted by Kodak's Photographic Technology Division showed that non-Kodak film could be processed through the same solutions, with good results, and without adverse effects on the Kodak film. But Kodak's management unswervingly rejected the pleas. And the record supports plaintiff's thesis that the purpose and effect were to impede the efforts of competitors in film manufacturing.

■ If, as the court holds, the evidence sustained the charge of anticompetitive actions affecting the film market, there remains defendant's interesting and difficult argument that plaintiff failed to show "causation" required to warrant any recovery for film overcharges. The argument is that before plaintiff could recover, it had to show not merely anticompetitive acts affecting the film market, but also "that such acts had such an impact on the prices of film as to cause Berkey to pay more, as a purchaser of film, than it would have paid but for the unlawful acts."[21] Or, as the point is reiterated in defendant's Reply Memorandum (p. 18), "the plaintiff must prove by facts a direct, proximate, causal connection between actionable conduct and the prices paid by it. . . ." As thus generally phrased, the position might seem to present no room for dispute. As elaborated, however, the argument is that the specific anticompetitive actions for which the defendant is found to be an unlawful monopolist must have their impact directly and proximately on price before a plaintiff may

recover the difference between the defendant's monopoly price and a lower, competitive market price. It is this argument, acknowledged as weighty, that the court has rejected, both in charging the jury and in deciding the present motion. This is not to hold, of course, that an antitrust plaintiff in a case of this nature may recover without proof of "causation." It is to say, rather, that the requisite causation is shown when, as in this case, the price charged by a monopolist, found to have acquired or maintained unlawfully the monopoly making possible the charging of that price, exceeds a competitive market price.

■ Stated more fully, the rule on which the verdict rests in this respect is that where a defendant

(i) has monopoly power in a relevant market,

(ii) has acquired or maintained this power by anticompetitive conduct, and

(iii) has employed its monopoly power to charge a price higher than what a competitive market price was or would have been,

a purchaser required to pay the monopoly price may recover the excess.

This follows, the court believes, from elementary principles of antitrust law in particular and tort law in general. It may help to explain this view if we refer for a minute to the more common and familiar situation of the price fixing conspiracy. Where two or more sellers combine to fix prices, it is the unlawful combination that gives them power over price. The results effected through the combination will determine the scope of their liability. If they fix a price below what competitors charge, say for standard predatory reasons, they may be liable to such competitors, but they will not, on that score, be liable to purchasers who pay that lower price.[22] If, in the more usual case, the price fixed is higher than a lawful, competitive price, customers may recover the difference.

---

**21.** Memorandum in Support of Motion 29.

**22.** It is unnecessary here to conjure with possible later claims of such purchasers after the conspiracy succeeds in destroying competitors.

But the conspiracy in that situation has accomplished what the monopolist achieves by himself, the setting of a price above that which would result from competitive forces.[23] If the monopolist has acquired or maintained the power to do that by unlawful means, and is thus an illegal monopolist, his power to set a monopolist's price is exactly the same species of evil, and for at least as compelling reasons, as the unlawful power of conspirators to set *their* price. The power to fix prices is after all the gist of monopoly power. When that power is unlawfully obtained or employed, the monopolist pursues the same proximate goal for himself as the price-fixing conspirators aim to share together. It accords with settled tort principles to hold the wrongdoer for the intended and proximate consequences of his conduct.

That defendant succeeded in freeing itself from competitive restraints is explicit in the record of this case. The Chairman of the Executive Committee of defendants' Board of Directors, who also serves on the Finance and Operations Committee, and has in turn occupied the offices of Vice President of Marketing, Executive Vice President, and Chairman of the Board, testified very simply and candidly that Kodak determines its prices without regard to what possible competitors might or may be doing.[24] Now again, insisting that its actions with respect to film afford plaintiff no claim for relief, Kodak says it "only sold its own product, as it, like any other seller, is entitled to do at prices it determined unilaterally."[25] Without seizing upon a phrase, it may fairly be said that the law countenances determining prices "unilaterally" only for the small class of monopolists entitled to that exceptional freedom from the pressures of competition.

Concluding that a monopolist exacting prices above a competitive level is liable for the excess when the monopoly has been illegally acquired or maintained, the court put to the jury the question "whether Berkey has proved by a preponderance of the evidence that the prices it paid for film purchased from Kodak were higher than those Kodak would have charged in the absence of its monopolization of the amateur film market." (Tr. 18834). Similarly, the jury was told to decide whether defendant had used its monopoly power "to insulate its products from price competition it would otherwise have had to meet, thus enabling itself to charge its customers unlawfully inflated prices for Kodak film." (Tr. 18835). The affirmative answers to

---

**23.** "[S]ince . . . [the decisions in *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), and *American Tobacco Co. v. United States*, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911)] it has been accepted law that not all contracts which in fact put an end to existing competition are unlawful. Starting, however, with the authoritative premise that all contracts fixing prices are unconditionally prohibited, the only possible difference between them and a monopoly is that while a monopoly necessarily involves an equal, or even greater, power to fix prices, its mere existence might be thought not to constitute an exercise of that power. That distinction is nevertheless purely formal; it would be valid only so long as the monopoly remained wholly inert; it would disappear as soon as the monopoly began to operate; for, when it did— that is, as soon as it began to sell at all—it must sell at some price and the only price at which it could sell is a price which it itself fixed. Thereafter the power and its exercise must needs coalesce. Indeed it would be absurd to condemn such contracts unconditionally, and not to extend the condemnation to mo-nopolies; for the contracts are only steps toward that entire control which monopoly confers; they are really partial monopolies." *United States v. Aluminum Co. of America*, 148 F.2d 416, 427–28 (2d Cir. 1945).

**24.** "Q. In connection with Kodak product pricing during this period of time [Dec. 1958– Jan. 1963, when the witness was a Vice President of the company, sharing responsibility for direction of U.S. sales and advertising, Tr. 2022] was consideration given to the pricing of competitive products?

"A. No. I don't really know what you're getting at. We didn't price, you know, with consideration of other products that were on the market. We priced from what we thought we could do the best and give us the greatest customer acceptance.

"Q. As far as you know, has that continued to be the general pricing policy of Kodak?

"A. Yes, I believe so."

(Tr. 5025).

**25.** Reply Memorandum 20.

these questions, and the award based thereon, are sustained in the court's view, by the record and the law.

*Color print paper overcharges*

The jury awarded $8,803,000 for color print paper overcharges. The court is compelled to conclude that this award must be set aside in its entirety because the evidence upon further study is found to be insufficient to sustain either the finding of liability or the award of damages.

The finding that Kodak monopolized the market in color paper would seem to be amply supported so far as the element of market power is concerned. Defendant's share of this market ranged during the years in question from a high of 91% in 1969 down to a low of 60% in 1976. It also appeared that the disappearance of a substantial competitor, GAF, in 1977 foretold a reversal of the downward trend. While the rather steep decline in the period 1969–1976 may be some reflection of a market no longer monopolized, the 60% figure would remain sufficient to uphold the jury's verdict in this respect.

■ The fatal void in the evidentiary foundation is the required proof of exclusionary or anticompetitive conduct. Plaintiff has struggled with characteristic vigor and imagination to show that the necessary demonstration was made. But the court's restudy of the arguments and the evidence invoked to support them leads to the adverse conclusion stated at the outset. A single item of anticompetitive behavior seems sustainable, namely, the insistence by defendant that its backprint appear on paper sold to photofinishers. But this is insufficient, the court concludes, to sustain the verdicts on liability and damages, or either of them. The several contentions, and the rulings upon them, are as follows:

(1) The claim of "systems selling" improperly employed, which has been held substantial in other connections, is asserted to apply here again. There are some docu-ments in the record indicating a desire and interest entertained by defendant's sales and other personnel to merchandise "Kodak equipment, chemicals, and paper on a systems basis. . . ." [26] The difficulty for plaintiff is the absence of evidence that the objective was implemented in any fashion that could fairly be condemned as anticompetitive with respect to the color paper market. There is no authority—and this case is surely not meant to suggest—that "systems selling" is inevitably impermissible for a company with monopoly power. The problem, as indicated elsewhere in this memorandum, is to appraise the specific circumstances, including such matters as timing, purpose, and effects. The evidence concerning color paper shows nothing approaching an arguably wrongful implementation of the systems selling objective.

■ (2) Plaintiff assails as exclusionary defendant's practice of evolving color print papers effectively usable by photofinishers with defendant's own film but not attempting to test for or seek similar compatibility with the film produced by other manufacturers. Accepting that this was defendant's practice, the court is upon reflection unable to discern in it anything wrongful or arguably exclusionary with respect to the color paper market. On plaintiff's thesis, Kodak was somehow obliged to fashion papers suitable for everybody's film. But had defendant done that, it might well have found itself attacked for developing techniques and capacity, in the style condemned in *Alcoa*, for seizing every new opportunity and building necessary capacity to the detriment of its paper competitors. The analysis plaintiff proposes in this respect might conceivably have suggested adverse impacts on film rather than paper makers. Without pursuing that speculation, the court finds no rationally persuasive utility in this contention for the claim of a color paper monopoly.

(3) Berkey complains in this connection, as it does elsewhere, of defendant's insistence upon using the Kodak backprint on

---

**26.** The quotation is from a 1968 Advertising Program of the Consumer Markets Division. Similar language is found in a couple of documents extending into and after 1969.

its color paper. The court has noted the plausible claim that this was improper *vis à vis* Berkey in its role as a photofinisher unhappy about advertising a competing photofinisher. But it has no perceptible force in the present context.

Berkey says the backprint "conditioned" consumers to want Kodak paper, thus forcing Berkey and others to buy it (at excessive prices). The evidence of such conditioning turns out finally to be thin to the point of nonexistence. Passing that, it tangles Berkey in contradictions. Until the submission of its prayer for equitable relief, see *infra*, plaintiff's claim has never been that it desired or demanded erasure of the backprint on *all* Kodak paper, only the elimination from paper purchased by Berkey. But if the conditioning argument were valid, that would have left Berkey clearly disadvantaged as against photofinishers accepting and using paper with the Kodak imprint. Furthermore, the argument is severely undercut by the evidence that during the years in question, Berkey's purchases of non-Kodak paper rose sharply; the percentage of its paper purchased from Kodak went from about 95% in 1972 to about 7% in 1977. The figures are drastically inconsistent with the assertion of a need for the Kodak mark.

The upshot is that the backprint practice remains condemned as unlawful leveraging of color paper market power into the photofinishing market. But this single item, relatively minuscule in the total picture, is held insufficient to sustain the finding of a section 2 violation in the color paper market.

(4) Plaintiff argues that Kodak pursued a policy of keeping competitors small, and that at least one purpose of this was to block competing paper manufacturers. The connective premise is that this "scheme had the purpose and effect of preventing a manufacturer of paper from establishing a relationship with a photofinisher which was large enough to provide an outlet for the sale of a sufficient volume of paper to enhance the manufacturer's ability to chal-

lenge Kodak's paper monopoly . . . ."[27] The trouble is that the evidence does not support the alleged "purpose" or "effect." There is no evidence that Kodak in fact entertained such a purpose. And there is no evidence that paper manufacturers had some special need of large photofinishers in order to challenge Kodak's supremacy.

(5) Plaintiff argues that it is unacceptably anticompetitive for Kodak, given its market share, to have its CP&P organization "purchase" only Kodak paper. This court finds, however, that there is no authority, and no sufficient basis in the principles of cases condemning exclusive dealing between separate entities, for holding that this single defendant was required to have its own division or department purchase from outside competitors. There is here a species of "foreclosure," to be sure. But it is a kind of internal arrangement that seems thus far to be entirely allowable. The decision in *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elec. Corp.*, 449 F.Supp. 1158 (D.Hawaii 1978), cited by plaintiff on this point, involved a course of conspiratorial conduct among separate entities and a massive history of acquisitions, rendering it decisively distinguishable, if not wholly uninteresting, for present purposes.

(6) Finally, plaintiff complains that Kodak introduced a new three-step finishing process and a new paper to go with it in 1971, to the detriment of the companies whose five-step papers were not compatible with the new process. Again, however, the requisite qualities to show anticompetitiveness are absent. There is ample evidence that the new process was a desirable innovation, for ecological and perhaps other reasons. The paper and process went together as a matter of sound technology, not on perverse or deceptive explanations. Kodak had and has no monopoly either of chemicals or of processing techniques. The new paper was not linked to a new form of Kodak film; both the old and the new were equally serviceable for relevant existing

27. Memorandum in Opposition to Kodak's Motion 49.

film types. In short, there are no indicia here of significantly exclusionary aims or consequences.[28]

Without emphasizing the point unduly, the marked decline in Kodak's color paper market share is surely not inconsistent with the conclusion that there was no anticompetitive conduct during the pertinent years and that competitors were indeed free to invade the market with substantial success. It is at least of passing interest to contrast this development with Kodak's remarkably steady maintenance of a share hovering between 85 and 90% of the amateur film market. Kodak presumably had no burden in this private action of proving the *absence* of exclusionary conduct. But cf. *United States v. Grinnell Corp.*, 236 F.Supp. 244, 247–48 (D.R.I.1966), and the specific reservation of the relevant question in the affirming opinion, 384 U.S. 563, 576 n. 7, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).[29] In any event, the record is found, after all, not to sustain this essential element of the color paper monopolization claim.

Furthermore, even if the conclusion were different as to liability, the verdict awarding damages for color paper overcharges could not stand. The only wrongful conduct shown by the relevant evidence had its impact upon the photofinishing market, not the market for color print paper. Thus, the requirement of causation is wholly unsatisfied. This may be contrasted with the verdict on film overcharges. There, too, a large part of the misuse of the film monopoly was in leveraging that impacted upon other markets. In addition, however, there was sufficient evidence of anticompetitive effect upon the film market itself to justify the award for resulting overcharges.

### Photofinishing equipment overcharges

Almost *de minimis* in the context of this case, but contested on grounds not frivolous, is the jury's award of $19,000 on Berkey's claim that it was required to pay excessive prices for six of Kodak's Dual Strand Film Processors purchased when these machines were alone in the field after the March 1972 introduction of the system comprised of the 110 camera, Kodacolor II film, new photofinishing chemistry, and this and related new machinery. Kodak challenges both the liability finding and the damage award.

█ As for liability, defendant argues there could be none because it was neither found nor claimed that Kodak monopolized or attempted to monopolize the photofinishing equipment market. It argues that a finding of unlawful leveraging in this setting could not stand. These contentions are the same, and are rejected for the same reasons, as those considered earlier on the photofinishing award.

█ Resisting the granting of damages in any event, Kodak points out that its Processor remained at the allegedly "excessive" price level even after other, less expensive machines emerged to compete with it, so that the failure to predisclose the new film and film format to other equipment manufacturers could not reasonably have been found to cause the claimed excess. Further, defendant cites the evidence that plaintiff bought an additional four Kodak Processors after other makers' machines, asserted to have been better and cheaper, were on the market, and argues that this overwhelms the charge that the Kodak product was sold at a price that can plausibly be denounced now as "excessive." Weighty though they may be, these arguments are not sufficient to defeat the jury's verdict.

There is no question that the Kodak Processor was alone in the market for several

---

**28.** Plaintiff stresses that CP&P stayed with a five-step process of its own for some period of time not shown distinctly in the record. This fact has been explained, however, on grounds that do not help plaintiff. The sinister implications Berkey would decry are not made visible by the evidence.

**29.** Plaintiff has preserved throughout the position, not accepted by this court, that a defendant shown to have monopoly power must shoulder the burden of justifying it as a condition "thrust upon" it in Judge Learned Hand's *Alcoa* phrase.

crucial months after March 1972. And the record shows what the jury was permitted to find was a striking relationship between this period of exclusivity and Kodak's earnings from operations on photofinishing equipment. Those earnings were at the rate of 4.6% in 1970 and 6.1% in 1971. In 1972, the year of the Processor's sole possession of the field, the rate leapt to 21.3%. Then it fell to 3.2% in 1973, followed by losses at the respective rates of 3.6% and 23% in 1974 and 1975.

As for Berkey's purchase of four more Processors after competitive machines became available, this point was made to the jury and evidently rejected as grounds for denying damages. The jury was within its authority in so ruling. The evidence showed that these additional Kodak machines were bought only for Berkey plants already committed by prior purchases to use of the Dual Strand Processor and other Kodak 110 processing machinery. Whatever reasons of convenience, technology, or employee training might have warranted this continued commitment, the evidence in this respect does not destroy or eliminate the adequate record on which the jury made its $19,000 award.

That award will stand.

### Robinson-Patman claims

The Robinson-Patman claims, though they involved for this case relatively modest amounts of money, presented some of the more perplexing questions both of law and of fact. Defendant's motion is on this aspect expectably imposing. It will be granted on the court's conclusion that the evidence was insufficient to establish damages.

This is not to say that the verdict on liability is so clearly sustainable as not to have given pause. The court has been troubled especially with questions as to the sufficiency of proof of (1) Kodak's knowledge that the lower prices were not cost-justified and (2) the substantial lessening of competition. In the end, if just barely, the finding of liability is found to be adequately supported.

30. Berkey duly excepted, and preserves its exception, to the court's refusal to instruct that

On damages, however, defendant is entitled to prevail. This subject was given to the jury, if somewhat *dubitante*, on the following theory:

"*First*, that Kodak's prices were based directly on its costs, so that the lower flash costs lowered Kodak's selling prices, *Second*, that Berkey set its prices by pricing down from Kodak's prices on comparable products." (Tr. 18865).[30]

The theory was thought to be allowable under the authority of *Enterprise Industries, Inc. v. The Texas Co.*, 240 F.2d 457 (2d Cir.), cert. denied, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957). Adhering to that position, the court finds the evidence insufficient to justify the jury's award, or, indeed, any award on this claim.

As to the first branch, the assertedly direct relationship between Kodak's costs and prices, a further review of the record reveals this evidence to have been exceedingly vague, general, and amorphous. Weighing heavily on the other side is the evidence that Kodak, far from pricing mechanically upward from its costs, actually charged the highest price it thought consumers would accept in quantities that would maximize profits; the relatively minor portion of kit prices represented by the flash unit; and defendant's evidence showing that the pattern of changes in its kit prices was unrelated to the pattern of changes in flash unit prices.

The second essential premise of the damage theory given to the jury is, if anything, still weaker on the evidence. Berkey presented no specific evidence tending to show that it actually did adjust its prices in the manner suggested in response to the supposed effects of the flash discounts on Kodak's prices. Indeed, the only evidence cited to support the claim that Berkey "priced down" from Kodak is *Defendant's* Exhibit 5360, an internal Berkey memorandum of March 6, 1975, which in the course of stressing Berkey's need to keep its prices low in order to compete successfully stated:

the amount of the price difference should without more be taken as the measure of damages.

"We cannot lose sight of this fact: we must be 20% below Kodak and/or Polaroid's dealer net price with comparable product, and we must be out with product as soon as possible after this introduction. This is not to say in certain cases we cannot be less than 20% but only that we should not build around that hope."

The vague, aspirational character of this statement of policy, which itself shows clearly the roughness of the relationship involved, embodied in a document issued several years after the alleged damages began to accrue, renders it far too slender a basis for the award of damages in suit. There being no credible proof of a profit squeeze suffered by Berkey, and thus no adequate proof of actual "loss to the plaintiff's business" attributable to Kodak's receipt of these discounts, *Enterprise Industries, supra*, 240 F.2d at 459–60; *Sun Cosmetic Shoppe v. Elizabeth Arden Sales Corp.*, 178 F.2d 150, 153 (2d Cir. 1949), the award of damages must be set aside.

## II. *APPLICATION FOR EQUITABLE RELIEF*

Plaintiff has applied for a broad array of equitable remedies, from divestiture through the publication of notice of the judgment. The subject has been thoroughly argued. The issues have been studied with care. For reasons hereinafter outlined, the court has concluded that all but two of the items of proposed equitable relief should be denied.

### Divestiture

The most drastic form of equitable relief sought by plaintiff is an order of divestiture. Specifically, plaintiff asks that Kodak be stripped of (1) its facilities for manufacturing cameras, projectors, photofinishing equipment, and "related items of equipment," (2) its facilities for the commercial processing and printing of film, and (3) such trademarks as "Kodak," "Kodacolor," and other scarcely less powerful names.[31]

Whether divestiture may be ordered as a species of the "injunctive relief" authorized by section 16 of the Clayton Act, 15 U.S.C. § 26, is a vexed question. Even in a case of unlawful acquisitions, the Ninth Circuit has said no, *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elec. Corp.*, 518 F.2d 913, 920 *et seq.* (1975), and the Third Circuit, more favorably disposed, has indicated that it would require a strong case to make that remedy seem appropriate, *NBO Industries Treadway Cos. v. Brunswick Corp.*, 523 F.2d 262, 278–79 (1975), rev'd on other grounds *sub nom. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). A thoughtful opinion by Judge Ward of this Court has also indicated that divestiture might be available to undo acquisitions in violation of Clayton Act § 7. *Fuchs Sugars & Syrups, Inc. v. Amstar Corporation*, 402 F.Supp. 636 (1975). There is a spread of other opinions on the subject. See *NBO Industries, supra*, 523 F.2d at 278 n. 17.

In the instant case, however, the case against divestiture seems too clear to require a firm choice among the divergent precedents. Accepting, as the court does, all the pertinent findings upon which the jury proceeded, this is not a case of unlawful acquisitions. The facilities plaintiff seeks to have stripped from Kodak are long established and integral parts of the organization unquestionably devoted in large measure for many years to constructive and lawful ends. The trademarks are likewise valuable, longstanding, and lawfully usable in diverse ways far transcending the boundaries of this particular lawsuit. The pertinent injuries to plaintiff, assuming they were not amply remedied by the award of substantial damages, and their recurrence not deterred by the effect of the award, *Brunswick Corp. v. Pueblo Bowl-O-Mat,*

---

**31.** Defendant characterizes other prayers for injunctive relief—e. g., relating to patents and claims for technological disclosures—as seeking "divestiture." Doubting that the label fits, but finding it makes no difference in the end, the court treats these aspects elsewhere.

Plaintiff does not treat under this rubric the proposal to require the dedication of the trademarks Kodak, Kodacolor, Ektacolor, Kodachrome, Ektachrome, Instamatic, and Pocket Instamatic, but the court finds it convenient to deal with this proposal here.

*Inc.*, 429 U.S. 477, 485, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), could not justify the devastating remedy of divestiture, which would, in all the circumstances, be punitive rather than appropriately curative. See *Hartford-Empire Co. v. United States*, 323 U.S. 386, 409, 65 S.Ct. 373, 89 L.Ed. 322 (1945).

### Concerning CP&P

As an alternative to divestiture of CP&P, Berkey seeks requirements that Kodak disclose to photofinishers information that has heretofore been given first, or only, to CP&P, thus giving the latter temporary or permanent advantages over other photofinishers.

The prayer rests upon a verdict embodying findings, *inter alia*, that defendant has used its film monopoly unlawfully "to foreclose competition, to gain a competitive advantage, or to destroy a competitor" in the market for photofinishing services. Berkey's compensatory damages on this score were fixed at a relatively modest $55,700. Also part of the pertinent background is a 1954 consent decree in *United States v. Eastman Kodak Co.*, (W.D.N.Y., December 21, 1954), which, *inter alia*, barred Kodak from selling its color films on a basis that included processing charges in a single purchase price; barred resale price maintenance on color films; required Kodak to license processors of color film to use its machinery and processes on reasonable terms; required the furnishing of technical literature and assistance to competing color film processors for a stated period of time; required Kodak to sell processing chemicals needed for color film processing not otherwise available; and required Kodak to make Ektachrome type film available in all formats in which it was then marketing Kodachrome film.

The evidence on this score showed, as the jury undoubtedly found (and the court concurrently finds), that CP&P was given advance notice of the introduction of Kodacolor II and other 110 films that permitted it to prepare itself with the necessary processes, machinery, and facilities so that it alone among photofinishers could commence processing 110 film from the date of its introduction; that CP&P received useful information concerning defects in, and variations among, the early emulsions of Kodacolor II which was withheld from independent photofinishers; that the 110 photofinishing equipment sold to independent photofinishers was injuriously inferior to that manufactured by Kodak for its own use; and that all of these acts and omissions were inspired by an intention to handicap independent photofinishers in their competition with Kodak. Other instances of use of Kodak monopoly power in color print paper and film which the jury might have found and deemed wrongful included the provision of inferior process control materials to independent photofinishers as compared with those developed for CP&P's use, refusal to supply formulae necessary for the employment of more economical bulk chemistry, rather than Kodak's kits, and the incomplete information provided by Kodak's technical sales representatives who simultaneously reported back to Kodak on the effectiveness of independent photofinishers.

All of these are items which reflect the use of Kodak's monopoly power in film or color print paper to handicap competitors and discourage competition in photofinishing. It is plain that Berkey has a very real stake in the future conduct of Kodak's film and paper operations which have been used in the past to give unfair and improper advantages over competitors to CP&P. The record supports the conclusion that Kodak will, unless enjoined, continue to engage in conduct of this sort. The problem is rooted in the structure of Kodak, where the film, paper, and processing operations are ultimately part of a single corporation. Believing divestiture to be uncalled for here, but convinced that a remedial scheme with lasting impact is needed, the court has given serious consideration to Berkey's proposals for elaborate disclosure requirements.

The details of Berkey's proposals reflect the complexities of relationships in an area

of complex technology. They also lead to instant awareness of how troublesome it would be for Kodak to share its developmental secrets in this fashion with 600 or more photofinishers spread across the length and breadth of the land. A problem of balancing seems to emerge.

Having employed its spectrum of monopoly powers to keep photofinishers subservient, frequently uninformed of vital things known to CP&P, and subject to the disruptive shocks of sudden change followed by belated clues for adaptation, Kodak is properly called upon to remedy this course of conduct affecting Berkey and other photofinishers in the future. The demand is specially compelling in light of the 1954 decree, which appears to have been frustrated, at least in spirit, by Kodak's practice of favoring CP&P. If the remedy can be achieved, however, without undue injury to Kodak, that course should be pursued.

■ The court concludes that the simplest and most readily manageable technique will be for Kodak to treat all photofinishers, including CP&P, alike in relevant respects. This will leave to Kodak power to disclose or not, but deprive it of the power to confer unfair and anticompetitive advantages upon CP&P. While it might seem superficially unrealistic, the record of this case contains persuasive evidence that Kodak is able, when this is desired, to maintain walls of secrecy between its various components. Accordingly, the decree will contain a requirement that defendant make no disclosures to CP&P concerning new or modified films, color print paper, processing chemistry, cameras, projectors, or photofinishing equipment without making identical disclosures to all other photofinishers with which it does business. Though this is simply stated here, the precise details of the decretal language, and any appropriate qualifiers, will, of course, be the subject of further consultations with counsel.

### Kodak Apparatus Division disclosures

■ As in the case of photofinishing, plaintiff's alternative to divestiture is a far-ranging program of compulsory disclosure of technological changes in other Kodak products affecting the product lines of the Kodak Apparatus Division, which produces, *inter alia*, cameras, projectors, and photofinishing equipment. Of particular importance among the varied and numerous other Kodak products whose introduction or alteration might affect such KAD products are Kodak's film and color print paper products. In addition to predisclosure requirements sought to be imposed affecting introduction of film and paper products, plaintiff seeks to bar introduction by KAD of new cameras and other product items which can be used with new or modified Kodak products from other divisions until eighteen months have elapsed from the time of the film or color paper introduction, or until at least two of KAD's competitors have offered comparable equipment designed to take advantage of the new film or paper, whichever comes sooner. Finally, plaintiff seeks to impose on defendant the obligation to become a supplier of last resort of components needed to compete with KAD in manufacturing comparable products which are not otherwise available and which Kodak manufactures for KAD's use.

Here, in contrast with the circumstances pertaining to photofinishing, the enormous sweep of what Berkey proposes, measured against Berkey's minute and apparently disappearing stake in this matter, counsels a different kind of conclusion. The main concern in this area is with camera manufacturing, a function which it is represented, without dispute, Berkey is abandoning. It is also undisputed that Kodak's share of the relevant camera market has declined precipitously in recent years, although the exact amount of the decline in the last full year, 1977, is subject to some dispute. Our record also shows that most if not all of the camera manufacturers in the market defined by the jury, who would be the most direct beneficiaries of the proposed relief, are not within the United States. It is this foreign competition that has eroded Kodak's share of the camera market. It may be that Berkey's proposals would benefit the American consumer. It may be that

they would not. The effects on American employment, and the economy generally, are still more problematical. The court need not adopt defendant's sometimes excessive appeals to patriotism in order to accept that interest far wider than our record and the court's competence are implicated at this point. See *United Shoe, supra,* 110 F.Supp. at 347–48. The case would stand differently if the public's Attorney General, chartered to speak for all the people, were here. See *United States v. Borden Co.,* 347 U.S. 514, 518, 74 S.Ct. 703, 98 L.Ed. 903 (1954). And it is perhaps relevant that the court has been made aware of, and tangentially involved in, the Federal Government's separate pursuit of its interest in this situation. See *GAF Corporation v. Eastman Kodak Company,* 415 F.Supp. 129 (D.C. 1976). Upon all the facts and circumstances the court concludes that the balance of the equities is against plaintiff with respect to the proposed requirements applicable to the Kodak Apparatus Division. These will not be ordered.

### Dealings affecting complementary products

Among the seemingly clearest courses of exclusionary conduct on Kodak's part were its programs with Sylvania (in developing the magicube, from 1967 to 1970) and General Electric (in developing the flipflash, from 1969 to 1975). The most obvious vice in these arrangements was Kodak's successful pressure for secrecy, preventing other manufacturers from developing cameras suitable for the flash device until after joint disclosures by the respective flash manufacturers and Kodak. Attendant aspects of a

dubious nature included Kodak's acquisition of patents and patent licenses from the flash manufacturers with the strongly arguable purpose and intended effect of exacting tribute from other camera manufacturers as the latter sought to make up for Kodak's head start with the magicube and the flipflash. The jury found, on ample evidence, that these arrangements unreasonably restrained trade, violating section 1 of the Sherman Act, and under the applicable instructions undoubtedly included this conduct in its findings of section 2 violations.

As part of the equitable relief, plaintiff seeks a broad set of prohibitions against dealings with any firm or person not a Kodak employee "relating to the design, development, modification, advertising or marketing of any existing or proposed amateur camera, amateur film, color paper, processing equipment, any complementary product, component of any of the foregoing or materials, products or services for use in or cooperation with any of the foregoing," except when accompanied by arrangements of early and full disclosure to all actual and potential competitors, sharing of information with these others, an opportunity for participation by the others, royalty free licenses, and other conditions designed to assure that Kodak receives no special advantage from any joint enterprise.

Again, the proposed relief ranges light years beyond the occasion. It includes many things besides cameras, the center of plaintiff's relevant (but disappearing), concern in this case.[32]

---

**32.** This is but one of several reasons for overruling the proposed provisions effectively to nullify a list of patents held by Kodak embraced in a separate heading in the plaintiff's petition. One aspect of these provisions covers the patents arising out of the magicube and flipflash programs. Berkey's past ability to circumvent these patents undercuts any claim of future harm stemming from the no longer novel technology. The threat of an infringement action by Kodak against Berkey adverted to in Berkey's papers gives slight pause, but does not require relief now; in any future action Berkey is entitled to attempt to prove patent misuse by Kodak barring it from enforcement. The remaining portion of plaintiff's ambiguously framed proposal on patents would apparently bar Kodak from enforcing any patents it now owns or acquires in the next ten years on its major lines of products related to amateur photography. Patents were at most a minor part of the evidence that led the jury to find, and the court to affirm, that the flash programs were unreasonable restraints of trade and exclusionary conduct. There is no finding, and no warrant in our record for finding, a persistent course of patent abuse that would augur future harm to anyone, much less Berkey in its new situation. The proposed relief affecting assertion of patent rights will not be embodied in the final decree.

There are infirmities in this prayer apart from its excessive breadth. While the violations in question seem at least as clear to the court as they did to the jury, there is no persuasive evidence that the verdict for damages, assuming it stands, will not serve as an adequate deterrent against repetition. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Berkey's own interest in the subject, minimal at best and apparently dwindling, is an exceedingly thin fulcrum on which to balance the world of "all" Kodak's competitors which Berkey would have us reach. There is here, as elsewhere in this aspect of the case, a public interest, perhaps fairly to be phrased as a "national interest," a concern never to be lost from view in considering questions of injunctive relief at the instance of a "private attorney general." See *Zenith Corp. v. Hazeltine*, 395 U.S. 100 at 131, 133, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); cf. *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

Balancing the several interests, public and private, the court discerns no sufficient basis for this species of injunctive relief in this case.

### Disclosure to film and paper manufacturers

The plaintiff proposes that Kodak be required to disclose information regarding new or modified Kodak film to color paper manufacturers, including the effects of the change on color paper and its processing, and modifications in the paper necessary to adjust to the film modifications. Such disclosure would have to be made in time to permit the paper manufacturers to respond to the changes prior to sale of the new film, would include all information given to Kodak's color paper division, and would be given by the time of disclosure to that division. Similar disclosure of information regarding new or modified color paper types would be required for competing film manufacturers.

This prayer for relief is severely undermined by today's ruling, *supra*, that the finding of liability respecting color paper cannot stand. In addition, it is subject to several objections similar to those noted in earlier connections. Any injury threatened to Berkey is at best remote, for it does not compete with Kodak in the manufacture of either film or color print paper. Nor does Berkey purchase film, except for purposes of resale, so that collateral effects of color paper modifications on film makers have at most a remote impact on it. The recent sharp decline in Kodak's share of the color print paper market also serves to reduce the impact of any Kodak product modifications in this area. To be sure, as a user of color print paper in its photofinishing operation, Berkey has some interest in film modifications affecting color print paper. Even so the effect on Berkey is at most secondary.

More critically perhaps, the verdict does not reflect any finding of injury to Berkey as a result of privileged information exchanges between Kodak's film and paper manufacturing divisions. The record could not support a finding of such injury to Berkey or to anyone else. There is no evidence to support Berkey's claim that paper and film were part of a wrongful system introduction, or any system introduction whatsoever. Thus, there is no showing of wrongful conduct in this regard in the past, and no showing of threatened injury to Berkey in this respect in the future.

The limited circumstances in which introduction of physically interdependent products may be deemed wrongful, stressed in connection with the motion for judgment notwithstanding the verdict, must be recalled here. Absent monopoly power and circumstances demonstrating that the physical interdependence was a tool for exclusion rather than a consequence of design for meritorious performance, there is nothing wrongful about introducing interdependent paper and film should this occur in the future. While the decree need not be limited to violations shown to have occurred in the past, it must not enjoin all possible breaches of law. *Hartford-Empire Co. v.*

*United States*, 323 U.S. 386, 409–10, 65 S.Ct. 373, 89 L.Ed. 322 (1945). It follows *a fortiori* that there is no need and no grounds to enjoin so broadly conduct which in many or most circumstances would be wholly innocent.

Insofar as wrongful injury may be threatened to Berkey as a photofinisher by reason of film innovations affecting it as a consumer of color paper, it will be adequately protected by the provisions assuring it of treatment comparable to that received by CP&P.

Accordingly, the relief sought under the present heading will not be granted.

*Prohibitions against refusal to deal and related practices*

Berkey seeks an assortment of injunctive provisions affecting the terms on which Kodak sells its film, color paper, and processing services, and on which it supplies color print paper for use by CP&P. These provisions would require Kodak to:

(1) make each variety of film available for sale in any length, width, format and form of trade dress or identifying labeling and packing requested by any customer, at a reasonable price as defined by its prices and profits on other film sales;

(2) discontinue selling and using color print paper bearing any insignia identifying Kodak as its manufacturer;

(3) accept for processing non-Kodak film, and slides and negatives made from non-Kodak film, at a reasonable price as defined by its prices on the processing of Kodak film; and

(4) abolish its policy restricting CP&P to use of Kodak manufactured color paper, equipment, chemicals, and other supplies, and require CP&P to purchase at least 40% of its requirements of such products from non-Kodak vendors whenever products "substantially comparable" in quality to Kodak's are available at prices lower than Kodak's.

The relief sought extends well beyond the wrongs affecting Berkey proved to the satisfaction of the jury or the court and therefore is to be denied in major part. The proposed provisions relating to the availability of film respond to wrongs which, if established, affected Berkey only indirectly. As for the necessary showing of future injury by threatened repetition of these wrongs, the case is even weaker. See *Zenith Radio Corp. v. Hazeltine Research, Inc.*, supra, 395 U.S. at 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). The restrictions on film availability, if wrongful, were only found to be so on the basis of particular facts and circumstances which added up to an overall pattern of willful maintenance of monopoly power. This is most clear as to the restriction of availability of Kodacolor II to the 110 format immediately upon its introduction. While injunctive relief need not be limited to the precise acts found illegal, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, supra, 395 U.S. at 132, 89 S.Ct. 1562; *Hartford-Empire Co. v. United States*, 323 U.S. 386, 409, 65 S.Ct. 373, 89 L.Ed. 322 (1945), the scope of past wrongs informs the court in its exercise of discretion as to injunctive relief for the future. It is pertinent, therefore, that the conduct Berkey wishes to have broadly enjoined occurred only in a specific setting unlikely to recur after the judgment herein. The court also notes that the relief sought would mainly benefit others than Berkey, a consideration of recurrent importance in this private action.

Similar thoughts apply in large part to the proposed ban on the placement of a Kodak backprint on its color print paper. The primary beneficiary of such relief would be Kodak's paper competitors. On the other hand, the evidence sustains a finding that Kodak, in its unique role as both paper manufacturer and photofinishing competitor, gained an unfair advantage over other photofinishers by virtue of its monopoly power, in that Kodak paper was only available with the backprint to independent photofinishers. In the setting of Kodak's monopoly power in color paper this was, or could be found to be, a device to

force Kodak's photofinishing rivals to advertise their competition.[33] The undisputed fact that Kodak provides neutral paper to Polaroid, presumably responding to similar concerns when expressed by a more powerful bargaining partner, shows that no undue hardship would be imposed on Kodak by requiring it to sell its color paper with or without the backprint at the option of the purchaser. Although Berkey no longer purchases the bulk of its paper from Kodak, the absolute volume of its purchases is large, and the photofinishing operation continues to be the backbone of Berkey's business. The harm threatened to Berkey for the future is clear. The evidence reflects no hardship for Kodak in omitting the backprint. Therefore, the decree to be entered will require Kodak to sell color print paper without the backprint at the option of the purchaser.

▮ The proposed requirement that Kodak process the film of all manufacturers is on even weaker ground than the film availability proposal. Not only is the posited effect of Kodak's exclusive policy on Berkey remote, and possibly incredible, resting on the hypothesis that (1) this policy cripples film competitors despite Kodak's low market share and relatively high processing charges, and that (2) this in turn hurts Berkey, which might process some share of an enhanced market of non-Kodak film. The theory is also somewhat paradoxical. The evidence shows that Berkey has been a leading processor of non-Kodak films and thus might be hurt by such a provision. It might be sufficient in the end to say that Kodak's exclusive processing policy was a modest aspect of the wrongful conduct which the jury might have found and that its prevention by injunction is not justified.

▮ More basic problems infect the proposal that CP&P be freed to purchase non-Kodak supplies and mandated to do so where appropriate supplies are available below Kodak's price. In the one area where

the jury might have found Kodak at fault in this respect, the purchase of color paper, the verdict is being set aside. In any event, Berkey is not a manufacturer of any of these supplies and cannot claim injury in that capacity.

### Prohibitions affecting systems selling

The subject of photographic systems broadly defined was the one most extensively addressed by the evidence. It was plaintiff's contention, clearly and appropriately accepted by the jury, that certain uses of photographic systems by Kodak represented anticompetitive methods by which the defendant enlarged, maintained, and expanded into allied fields its several monopoly positions. The most important and extensive matter under this heading was the coordinated development in secret, and public presentation in March 1972, of Kodak's initial line of 110 cameras, Kodacolor II film in the 110 format, new photofinishing equipment, and a new photofinishing process. The jury evidently found the effects of this included giving Kodak temporary absolute monopolies in several markets, rendering competitors' inventories obsolete, and otherwise handicapping competition in the affected markets. Another, less sweeping and devastating development of the same nature was the simultaneous introduction of the XL movie cameras, Ektachrome 40 and 160 movie film types, and Ektachrome Autoprocessor in August 1971. The jury could have found this to have been exclusionary conduct in the film market, although for any one of several possible reasons it found Kodak not liable for attempted monopolization of the movie camera market.

As noted above, the jury's verdict reflects a determination that the 110 system was a deliberate, anticompetitive mode of economic warfare rather than unobjectionable competition on the merits. The same finding could have been made as to the XL

---

**33.** The court's conclusion, *supra*, that the use of the backprint to injure photofinishers is insufficient to support the verdict of liability for monopolization of color print paper does not bar the award of equitable relief. The record amply supports a finding that future harm to Berkey by this wrongful use of Kodak's monopoly power in color print paper is threatened.

system. The court has concluded that this aspect of Kodak's conduct lends powerful support to key aspects of the verdict.

Claiming that the remedy must be more than money damages, plaintiff now asks for a variety of forms of injunctive relief intended to prevent Kodak from reaping anticompetitive benefits from photographic systems. Major aspects of these prayers, including divestiture and predisclosure, have been treated earlier. Under the present heading the plaintiff asks for provisions governing the merchandising (as distinguished from introduction) of photographic systems.

Plaintiff now asks that Kodak be required to assign separate personnel and separate advertising agencies to each of the following products or lines of products:

1. Conventional still cameras
2. Instant cameras
3. Movie cameras
4. Slide and movie projectors
5. Amateur conventional film
6. Instant film
7. Color print and processing services
8. Photographic paper
9. Any other product or group of products sold by defendant.

Further, plaintiff would have Kodak enjoined from packaging, advertising, or promoting more than one product at a time in any fashion, and would require Kodak to announce, in advertisements and elsewhere, that it is in no respect necessary or even advantageous to use complementary Kodak products rather than a competitor's in conjunction with a particular Kodak product (as: film with cameras, film with processing services, film with color paper, cameras with film). Finally, Kodak would be required to use its best efforts to prevent any person other than a retailer from using or recognizably depicting Kodak's name, trademarks, other trade names, identifying insignias, or products in any way in advertising, promotional material, or any other manner.

■ Again, the prayer for relief outruns the proof and the needs of the plaintiff. As reflected in the charge to the jury at the conclusion of the liability trial, the advertising and promotion of products in the form of systems was a minor element in the case. It could at most be corroborative of the exclusionary nature of the introduction of new product systems, and could not represent a discretely cognizable form ' of wrongful conduct in and of itself. There was no occasion to find, the jury did not find, and the court would not be prepared to find that the merchandising of photographic systems must be deemed wrongful, always or everywhere. Nor is there in the present record sufficient basis to conclude that wrongful instances of "systems selling" are "likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

What the verdict may be fairly held to establish is that the sudden explosion of new "systems," where Kodak has monopoly power in several interrelated markets, where the evident propose is not a boon to consumers but a blow to competitors, and where other indicia of monopolistic intent are present, might well be found another time to be evidence of a violation of section 2 of the Sherman Act. If such things come to pass, merchandising appeals for such wrongfully introduced systems may conceivably play an exclusionary role. But the prospective relief plaintiff seeks would forbid all kinds of conduct outside the dimensions, or even the broadest penumbra, of what was proved or foretold on this case. No justification is shown either for the sweeping proposal plaintiff makes on this subject or for any lesser version.

*Robinson-Patman Act provisions*

■ Having found the verdicts on liability to be barely sufficient to withstand Kodak's motion to set them aside, and having set aside the awards of damages under this heading, the court denies the injunctive relief for which plaintiff moves. The prayer is for a sweeping prohibition against future violations of section 2(f) in all spheres of Kodak's operations and against Kodak's

purchasing on terms not stated in generally available price lists maintained by its suppliers. Nothing in the record shows any threat of harm to Berkey through repetition of the practices demonstrated at trial. Even on a stronger record, it would be highly questionable to order wholesale compliance with "the law" embedded in the uncertainties of Robinson-Patman. See *Hartford-Empire Co. v. United States*, 323 U.S. 386, 410, 65 S.Ct. 373, 89 L.Ed. 322 (1945). The requested relief on this score will be denied.

*Residual categories*

The proposed decree embodies a variety of other items, such as a requirement that Kodak afford functional discounts to wholesalers and original equipment manufacturers as well as quantity discounts; a prohibition against market allocation, including allocation among different Kodak companies; and a long list of orders enjoining such things as full-line forcing and minimum quantity requirements for Kodak dealers, cross-subsidization among different Kodak operations and sales below costs, restrictive covenants in employee contracts, and all manner of acquisitions of technology, patents, trademarks, assets, or other business interests. Plaintiff's arguments supporting these various forms of relief have been considered in detail. Most of the items sought are related to conduct about which there is no evidence in the record. Others, if adverted to in passing, were never considered by the jury as bases for finding wrongful maintenance of monopoly or any other illegality. Without pursuing them in further detail, these sundry items are denied.

To summarize on the two motions before the court:

I. Defendant's motion for judgment notwithstanding the verdict is granted to the extent that (A) the award of $1,417,330 on the claim respecting magicube cameras for the year 1971 is set aside; (B) the award of $8,803,000 on the claim for overcharges on color print paper is set aside; and (C) the

awards of $200,000 and $45,100 for violations of section 2(f) of the Robinson-Patman Act are set aside; and is otherwise denied.

II. Plaintiff's prayer for equitable relief is granted in the two enumerated particulars, and is otherwise denied.

These rulings will be embodied in a final judgment to be prepared in consultations between counsel and the court.

## ON MOTIONS FOR NEW TRIAL AND FOR REARGUMENT OF MOTION FOR JUDGMENT N.O.V.

Defendant moves variously for a new trial, to amend the judgment, and for reargument of its motion for judgment notwithstanding the verdict. Some of the contentions made in this fashion are merely stated, not argued in any substantial sense, and may be left for full airing elsewhere. The questions that seem to merit treatment here, and their resolution, are as follows.

### I.

Perhaps the headiest of the subjects now presented, for the first time in this long litigation, is a cluster of constitutional issues as to Section 2 of the Sherman Act and Section 4 of the Clayton Act, on their face to some degree but more particularly as applied in this case.

In its broadest form, defendant's attack on § 2 of the Sherman Act as void for vagueness on its face would rewrite nearly a century of history, solid precedent, and scholarship. The refutation of this most sweeping position is amply outlined in plaintiff's opposing papers. The court sees no benefit in tarrying over the principles and authorities that seem so decisively opposed to defendant's views.

Approaching the narrower, more pointed effort to show that § 2 must be held void for vagueness in its application to this private action, defendant says that it "does not here challenge the application of the antitrust laws in cases like *Alcoa*[1] or *Unit-*

1. *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945).

ed Shoe,[2] nor * * * contend that the results reached there were necessarily unconstitutional."[3] Those were decisions by judges, defendant argues, and involved merely equitable relief, not huge damage claims. It is one thing the argument runs, to have *judges* manipulate concepts like "honestly industrial," "exclusionary," and "anticompetitive," for purposes of decreeing future changes in the lives of large corporations. It is something quite different to unleash a *jury* under such concepts to consider large money claims "that *retrospectively* punish conduct newly found to violate the law."[4]

In light of defendant's steady insistence upon the limited capacities and understanding of lay jurors, it is fair to recall again at this final stage that the preference for a jury was defendant's, not plaintiff's. As for the notion of "retrospectivity," however close defendant now comes to accepting *Alcoa* and *United Shoe* as not "necessarily unconstitutional," both *were clearly more striking glosses on existing law than anything decided in this case.* Yet even as to *Alcoa*, and its *in haec verba* endorsement by the Supreme Court in *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), the claim that a fundamental alteration in the law of monopolization was effected has been squarely rejected. See, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 495–502, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In the latter decision, rejecting the contention that damages could be awarded only from the date of *American Tobacco*, the Court stressed the basic historical continuity in the interpretation of the Sherman Act, stretching back to 1912, and found ancient precedent for the rule that the conduct element of the monopolization offense does not require proof of conduct not honestly industrial. *Id.* at 496, 88 S.Ct. 2224. The Court concluded that there had been no "sharp break" with the line of earlier authority, and that there were no prior decisions justifying potential antitrust defendants'

> "thinking that then current antitrust doctrines permitted them to do all acts conducive to the creation or maintenance of a monopoly, so long as they avoided direct exclusion of competitors or other predatory acts." (Footnote omitted.)

*Id.* at 499, 88 S.Ct. at 2234.[5]

■■■ The Court therefore found it unnecessary to consider whether criminal due process doctrines, such as those relied upon by the present defendant, barred an award of damages for years prior to 1946, there being no

> "clearly declared judicial doctrine upon which * * * [the defendant] relied and under which its conduct was lawful, a doctrine which was overruled in favor of a new rule according to which conduct performed in reliance upon the old rule would have been unlawful."

*Id.* at 496, 88 S.Ct. at 2233. Similarly we need not consider whether the present case denied defendant due process, for no radical or even significant transmutation of the law was worked herein.

The court's instructions to the jury in the instant case reflect a direct application of the principles of *Alcoa* and *United Shoe.* The novelty of this application, which the defendant protests so vigorously, lies only in the set of facts to which these principles are applied. As defendant itself argues, antitrust offenses are at root an outgrowth of the law of torts. It is a fundamental tenet of tort law that the application of settled general rules to novel or unique fact situations by a trier of fact does not create

---

**2.** *United States v. United Shoe Machinery Co.*, 110 F.Supp. 295 (D.Mass.1953), aff'd *per curiam*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

**3.** Memorandum Concerning Constitutional Issues 5.

**4.** *Id.* at 6 (emphasis in original).

**5.** The dominant thread of continuity described by the Court is but one of several sufficient reasons for rejecting Kodak's argument that prior decisions affirming the constitutionality of the Sherman Act are not controlling here. The court rejects this argument as totally unfounded.

any constitutional infirmity. Triers of fact, including most commonly juries, routinely determine civil liabilities by deciding whether a general standard—such as reasonable care—was observed or breached by a particular course of conduct. No one would seriously tender the argument that a tort judgment was infirm because no precedent gave warning that the particular factual pattern would be deemed grounds for liability.

Defendant's constitutional thesis about what "lay jurors or business people" must be deemed incapable of understanding would draw into desperate question a large portion of the grave business to which jurors attend daily in our system. The complaints as defendant makes them, about the lack of "objective or explicit standards," [6] about the jury's being commissioned "to consider and weigh in an undefined manner" an array of evidentiary factors,[7] about the "subjective" form in which terms like "exclusionary" and "anticompetitive" were used— [8] such complaints, if accepted, would have meant a jury trial of a case like this one was doomed from its inception for fatal vagueness. It would also mean that much else that juries do is unacceptable—like compendious findings on a host of evidentiary factors, often with the gravest consequences, as to whether there has been proof of states like "malice," "willfulness," or "negligence," "recklessness," "wantonness," and "good faith."

The modest extrapolation of the settled principles of *Alcoa* and *United Shoe* to new facts could not have astonished defendant's legal advisors. Our record reveals that Kodak's counsel warned of potential liability for practices involving gratuitous use of

photographic systems. Such practices in fact constitute the central core of the conduct supporting the monopolization verdicts in this case. More generally, Kodak had plenty of experience and advice from which to imagine, more than vaguely, that its powers as a monopolist, previously questioned in court by both the Government and private parties, should be used with care and consideration.

Kodak invokes Mr. Justice Frankfurter's observation, in dissent, that "[t]he vagueness of the Sherman Law was saved by imparting to it the gloss of history." *F.T.C. v. Motion Picture Advertising Service Co.*, 344 U.S. 392, 405, 73 S.Ct. 361, 369, 97 L.Ed. 426 (1953). History did not stop in 1912. The years since then are marked by a familiar process of gradually shifting interpretation of the Sherman Act, without any radical breaks, as the Court observed in *Hanover Shoe, supra*. As frequently happens, defendant cheerfully accepts old cases that made new law, but urges strenuously that the course of organic growth had to stop before this case.[9]

The general suggestion of differences between cases in equity—where divestiture, deep changes like bans on leasing machinery, and other drastic measures may be taken—and damage suits is scarcely compelling on the question of what may be void for vagueness. Not only is the point unpersuasive as an original abstraction; it is actually premised upon an inaccurate supposition that there is a sharp dichotomy between suits in equity and damage claims. As plaintiff reminds us, *United Shoe*, pressed by defendant as a major example of the gentler equity sanctions, served in fact

---

6. Memorandum Concerning Constitutional Issues 11.

7. *Id.*

8. *Id.* at 12.

9. Kodak pursues its course of misconception in observing that *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir. 1978), petition for cert. filed, 46 U.S.L.W. 3695 (May 1, 1978), and *Greyhound Computer Corp. v.*

*International Business Machinery Corp.*, 559 F.2d 488 (9th Cir. 1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978), relied upon by this court to corroborate its interpretation of the seminal *Alcoa* and *United Shoe* precedents, were decided after the introduction of the 110 camera. None of these cases purported to depart from settled precedent; had they done so the defendants therein could presumably have raised the argument made here by Kodak.

as predicate for private damage awards. *Hanover Shoe v. United Shoe Machinery Corp.*, 245 F.Supp. 258 (M.D.Pa.1965), vacated in part on other grounds, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). And that is, of course, a standard course of events, explicitly charted by statute, 15 U.S.C. § 16 (1976).

Further elaborating the claim that it met an unforeseeable fate under a vague statute unpredictably applied in this case, Kodak urges that the standards under which the jury decided were insufficiently "objective." In fact, Kodak says, the jury proceeded without "any ascertainable standard * * *."[10] The court, it is claimed, acted "legislatively and defined a new violation of Section 2"[11] leading to a verdict which must be condemned as "subjective determination" and a "legislative act."[12] The settled terms of familiar antitrust precedents cannot be constitutionally administered in a jury trial, defendant argues, because they are unintelligible to those they govern. "Whatever meaning words and phrases like 'anticompetitive,' 'exclusionary,' 'honestly industrial' and 'thrust upon' might have to judges and specialists in arcane antitrust law, they could have no comprehensible meaning to lay jurors or business people."[13]

As is recurrently true in the motion papers now before the court, these contentions include some remarkable post-verdict novelties. Repeatedly in its own requests to charge Kodak employed words—"anticompetitive," "exclusionary," "substantial," "isolated," "significant," "trivial"—that it now assures us are too imprecise to achieve a constitutional minimum of guidance for jurors. The revealing significance of such an altered stance, even apart from the technical waiver of the new arguments, is clear without extended comment.

In any event, if it were permissible at this late juncture, the claim of vagueness of the offense as applied in this case would have to be evaluated in the setting of the charge as a whole, not by conjuring with a handful of words, stripped of the context intended to give them meaning. Some 24 legal-size pages were devoted to the explication and definition of exclusionary conduct in the court's charge to the jury. The merits or errors to be found in the full charge, along with the contributions or noncontributions to the final product by the parties in the long hours of consultation and study by court and counsel, will ultimately have to be decided by a higher tribunal. It is pertinent, however, to protest that the court defined the applicable legal standards as precisely, objectively, and intelligibly as it could. When asked for suggestions to tighten any remaining ambiguities, defense counsel was only able to suggest language wholly withdrawing the central factual questions from the jury, by instructing that introduction of new products and the failure to predisclose them could under no circumstances be found to be wrongful conduct. The court's reasons for rejecting these proffered rules of *per se* nonliability are set out in the Memorandum on Post-Trial Motions and need not be repeated here. Viewed in this light, however, it becomes clear that the true gravamen of defendant's argument is not the assertedly vague definition of the offense, but the court's interpretation of § 2 of the Sherman Act in light of the major precedents.

 In any event, defendant's submission that it has been entrapped by a vague statute into an astonishing judgment nobody could have predicted presents a remarkably truncated and inaccurate view of the proceedings. Defendant argues its constitutional position much of the time as if the verdict rested on the simple and fantastic proposition that a manufacturer must disclose in advance new products or product systems. If that were the case, one would be hard put to know how or why defendant spent more months than plaintiff putting on its evidence to avoid liability. Actually,

---

**10.** Memorandum Concerning Constitutional Issues 10.

**11.** *Id.* at 13.

**12.** *Id.* at 14, 16.

**13.** *Id.* at 19.

of course, there never was or could have been any such finding. At other times, ricocheting to another unreal extreme, defendant complains that it was condemned for its mere "status" as a monopolist, finding it possible in that context to cite as relevant authority the protection from such a fate given for a narcotics addict in *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). But, of course, this case, and settled law, involves neither "status" nor conduct *alone*. What the jury was permitted to consider was a claim that the proof showed (1) an awesome degree of monopoly power, (2) an array of arguably anticompetitive actions in the exertion or maintenance of that power, and (3) resulting injury to plaintiff. The question of predisclosure, albeit a prominent subject, was only one of a number of matters to be considered in deciding the second element. It is thus neither accurate nor useful to insist starkly that the case stands for some vague, general requirement of predisclosure. It is as if *United Shoe* were read to outlaw long-term leases of machinery, *Alcoa* to forbid systematic expansion of productive capacity, or *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), to condemn bargaining for first-run movie exhibition rights.

Another barrage of new constitutional ideas following the verdict is aimed at the award of treble damages. As will appear below, many of these contentions, if they had merit, would be foreclosed because all of them, including those that do not flatly reverse prior positions, should have been offered as requests to charge the jury.

■ Defendant's broad submission is that the statutory authorization of treble damages in § 4 of the Clayton Act offends against at least three protections of the Bill of Rights (in the Fifth, Sixth, and Eighth Amendments). The argument begins with the proposition, quoting a phrase from an 1890 debate, that the provision is "purely penal and punitive." [14] Even on the level of labels, if they were decisive, defendant would not get very far with this point. The cases, including several quoted by defendant, are agreed that § 4 is not "penal" in any sense useful to defendant. *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); Cf. *City of Atlanta v. Chattanooga Foundry & Pipeworks*, 127 F. 23, 28–29 (6th Cir. 1903), aff'd, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906); *Leonia Amusement Corp. v. Loew's Inc.*, 117 F.Supp. 747, 756 (S.D.N.Y.1953); *Winkler-Koch Engineering Corp. v. Universal Oil Products Co.*, 100 F.Supp. 15, 29 (S.D.N.Y.1951). The fact that some authorities also indicate that the trebling of damages serves a punitive function in addition to its compensatory, deterrence, and remedial functions, does not vindicate defendant's constitutional thesis. The idea of punitive damages, and, specifically, treble damages, in civil cases, to be assessed by the court, not the jury, is no novelty. See *Seymour v. McCormick*, 57 U.S. (16 How.) 487–88, 14 L.Ed. 1024 (1853). Nor is the principle affected by the large size of the verdict in this case against a self-described "giant." It is worth noting in this connection that our record reflects the difficulty confronting a plaintiff seeking to prove actual damages in a monopolization case. The task, as plaintiff's counsel aptly described it, is to attempt the reconstruction of "a world that never was." In some instances the court was required to disapprove all plaintiff's proposals for measuring particular categories of damages, despite the fact that no alternative was presented by the defendant and despite the probability that some injury, however uncertain in amount, had been inflicted upon the plaintiff. Thus the trebling of damages is compensatory in the special sense that it tends to ensure, albeit in a rough fashion, that wrongs do not go unredressed because of the inherent difficulty or impossibility of proving all items of damages.

14. From a speech of Senator Hoar, 21 Cong. Rec. 3147 (1890), reprinted in 1 E. Kintner, The Legislative History of the Federal Antitrust Laws and Related Statutes 283 (1978). The remarks of Senator Regan, following those of Senator Hoar, stressed the compensatory and non-criminal nature of treble damages. *Id.*

■ We turn to a series of arguments based upon constitutional theories which the court will dismiss on the grounds, *inter alia*, that they contradict positions taken before the charge and verdict or inject novel views of the law that the court was never given timely opportunity to consider for inclusion in the jury's instructions. Taking these in order, the first is not the least astonishing: the court was required to charge, Kodak says, that the jury must find specific intent to monopolize, like the *mens rea* required in most criminal offenses. Not only was this never suggested earlier; even as late as its motion for judgment notwithstanding the verdict, Kodak was complaining that the court had erred in allowing the jury to consider intent in any way at all on the charge of monopolization. See the court's Memorandum on Post-Trial Motions of June 16, 1978, pp. 16–19. Changes of position so late and breathtaking are an imposition upon the court and opposing counsel.

■ Defendant's contention is in any event devoid of merit. The opinion in *United States v. United States Gypsum Co.*, —— U.S. ——, ——, —— n. 13, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), which held that *mens rea* was an element of the criminal offense under § 1 of the Sherman Act, as a matter of common law doctrine concerning criminal offenses but not as a matter of constitutional law, expressly noted that no such requirement applies to civil antitrust offenses.

■ Similar to the new thought about *mens rea* are defendant's complaints that plaintiff was not required to prove its case beyond a reasonable doubt, that Kodak was entitled to a presumption of innocence, and that Kodak was entitled to indictment by grand jury as a prerequisite to trial on the claims in this action. Defendant never raised any of these exotic thoughts before. They are not tendered, however, as complaints about the instructions actually given, but to implement the thesis that the judgment in this case imposes what amount to criminal sanctions. They are not significant additions to the basic point, which has been considered earlier.

■ Finally, defendant now opines that the Seventh Amendment required the jury, not the court, to assess treble damages if they were allowable at all. Kodak took the pre-verdict position everyone else has taken until now—that the question was for the court, not the jury. This is undisputedly the law, and reflects a clear congressional intent that trebling of damages be automatic. *Noble v. McClatchy Newspapers*, 533 F.2d 1081, 1091 (9th Cir. 1975), vacated on other grounds, 433 U.S. 904, 97 S.Ct. 2966, 53 L.Ed.2d 1088 (1977); Cf. *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974), cert. denied, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975); *Herald Co. v. Harper*, 293 F.Supp. 1101 (E.D.Mo.1968), aff'd, 410 F.2d 125 (8th Cir. 1969).

## II.

Defendant's arguments on liability and the amounts of the several damage awards retrace for the most part terrain that has been traversed repeatedly at several stages of this lengthy case, both before and after the verdicts. Many of the arguments were recognized throughout to be substantial, and their force has not diminished in the process of further refinement and rethinking. Some of the arguments now made are novel, were not presented (or certainly not presented in their present shape) at earlier stages, and may come too late for this reason. In any event, having studied each contention, the court finds no sufficient reason either for granting a new trial or for modifying the judgment. Nor does it seem useful to add to the *nisi prius* literature with repetitions or elaborations of views heretofore recorded.

It should be acknowledged, however, that at least two of the contentions now made with special cogency have given the court special pause: (1) the argument against film damages prior to the 110 camera introduction, and (2) the argument for reduction of film damages on grounds of non-comparability of other manufacturers' film. It is a close question indeed whether the relevant

evidence of anticompetitive conduct within the limitations period preceding March 1972 supports the award for that period. And the evidence of comparability in two or three categories is scarcely imposing. Nevertheless, having tarried at some length over these problems, the court arrives in the end at a reaffirmation of the judgment as it was entered.

 Without responding here in any detail to the characteristically full memoranda of the parties, the court recalls one or two basic thoughts. First, there was enough evidence of conduct the jury could have found anticompetitive carrying over from before 1969 into and through the period in suit. While conduct preceding 1969 could not be, and was not, allowed as grounds for liability in itself, its continuation was available and presented to the jury with respect to the succeeding times open for judgment. A second, related point is the court's premise, contrary to defendant's, that the heart of the offense denounced in Sherman § 2 is the monopoly power enabling its possessor to block competition and exact an excessive, monopolist's price. On this premise, while proof of anticompetitive conduct in acquiring or maintaining the power has been held by the court (contrary to plaintiff's view) to be essential to complete proof of the offense, plaintiff is not required to show either that this conduct in itself accounts for the excessive price or was in itself the *sine qua non* to continuation of the monopoly power during a particular period under scrutiny. If this premise is wrong, the verdict may well be infirm. Having reconsidered it once again, however, the court adheres to it.

 The court has similarly revisited doubts concerning the extent of the jury's award on film, particularly on the issue briefed effectively by defendant concerning comparability *vel non* of other makers' films as the basis for computing the excessiveness of defendant's price. Again, however, the court finds the evidence sufficient in the last analysis to sustain the jury's award. Where a monopolist, like Kodak in this case, comes close to having the whole national market, the proof of comparability is a large challenge. If the whole subject were narrowed to this focus, plaintiff might be deemed to have failed with respect to some categories of film products.

It is to be remembered, however, that the measure of damages starts from a thorough demonstration that defendant was exercising unlawful monopoly power and charging prices yielding clearly monopolistic returns. Where the competition was so thin as to approach nonexistence, we might plausibly have started with Kodak's remarkably huge rate of return on investment on film (ranging from 61% to 70% over the years in question), considered the evidence as to sharply lower rates of return on non-monopolized products (demonstrated with respect to some of Kodak's lines), and employed the difference as a basis for computing the unlawful excess. Indeed, plaintiff proposed several such means of computing film overcharge damages. Two were withdrawn after the court intimated an adverse ruling, and the third and final one, PX 6257 for identification, based on application of Kodak's roughly 30% return on investment on x-ray film sales, was not allowed by the court to be placed before the jury. The damages computed on PX 6257, $25,181,000, far exceed the more generous of the two price comparison measures the jury was permitted to consider, and would be more than double the actual award.

Kodak urged, and the court agreed, that comparisons with other manufacturers' prices would yield a more appropriate approximation—on a matter for which approximations are, after all, the best we can achieve. Starting from this base, the jury was admonished that plaintiff would recover nothing on account of higher Kodak prices resulting from "circumstances and conduct on Kodak's part that were lawful and permissible—such factors as higher quality, better marketing methods, superior service, customer preference and elements urged by defendant."

The jury was also instructed that it could accept or reject Berkey's contentions regarding comparability in whole or in part. In awarding a sum $3,203,000 less than the maximum claim Berkey was allowed to

place before it, the jury may well have exercised judgment as to the imperfect comparability of competing film with Kodak film. A finding of differences in film quality would not require a conclusion that they account for the entire price difference. Nor does the scarcity of comparable film in some market sectors demonstrate the absence of injury. Recalling the vastly more generous award that would result from comparison to the non-monopolized x-ray film market, while standing behind the ruling eschewing unnecessary speculation, and granting that the basis for finding comparability (even though all the evidence points to identical species of consumer uses) is hardly conclusive, the court does not find that the actual sum awarded must be condemned as unreasonable.

Taking the pertinent evidence as a whole, and stressing again the familiar principle that an injured antitrust plaintiff is often unable, and is not required, to prove damages with close precision, the court concludes once again that the film damage award, if undoubtedly generous, was within the range of permissible jury judgment.

### III.

The trial began with a jury of six and six alternates. As a result of a procedural modification initiated by the court on its own motion, defendant's liability was eventually determined by a unanimous jury of ten rather than six.[15]

 Much later, after six days of deliberations on liability, one juror was excused by the court in a telephone call in the wake of a snowstorm that had closed the courthouse (and the City) when she complained of chest pains that had persisted for some days and insisted she had to go to the hospital. Two hours after this had happened and about 1½ hours after being informed, defense counsel said he was "concerned" that the court had "acted hastily" in excusing the juror with asserted chest pains, but made no such suggestion as is now made, that the episode should be deemed an error warranting a mistrial.[16] On the same day of paralyzing weather, when there was a general comedy of errors that amused nobody in assembling our jury, the court, with counsel's consent, went to the jury room to notify the jurors about meal arrangements, why we were waiting, and what the schedule would be. Seeking to set aside the verdict returned on the afternoon of the next day and citing the distinguishable criminal law precedent of *United States v. United States Gypsum Co.*, —— U.S. ——, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), defendant urges that these episodes require a new trial of this case that took some seven months to try the first time. Beyond the *Gypsum* citation, there is no effort to brief the law or the facts involved. There is no suggestion of how Kodak might have been prejudiced by any of these incidents. There is no indication, and the court knows of no reason to believe, that the juror who was excused— and who would have been an excused alternate but for the court's prior intervention

---

**15.** After the trial had been under way for three months or so, the court realized that because the proceedings were bifurcated, an avoidable complexity might arise at the end of the first phase if customary practice was followed. That is, if the alternates were excused when liability deliberations began, and if, as came to be the case, defendant was found liable, we would proceed to the damages trial (of substantially greater length than most trials) with no alternates at all. To avoid this the parties were invited to stipulate, and did stipulate, that all jurors, regulars and alternates, who remained with us when it came time to decide would participate in seeking a verdict, all thus becoming "regular" jurors; that the same rule would apply to both phases of the case; and that a unanimous verdict would be required no matter

what number participated, provided that there was no agreement to accept a verdict by any number less than six. Shortly after this stipulation was reached, the court, with the consent of counsel, excused one of the twelve jurors whose husband had suffered a heart attack.

**16.** It seems fair to treat the present contention as a belated, retrospective motion for a mistrial. For the practical effect of what has happened is that Kodak, while registering its criticism at the trial, without seeking relief and after nothing could be done about it anyhow, made no suggestion that the trial should be stopped, took its chances on the verdict, and now wants the adverse result erased.

mentioned above—might have had a special place in her heart or mind for Kodak. It is difficult to know how defendant now imagines there is merit in complaining about the excused juror or the other attendant events. See *United States v. Houlihan*, 332 F.2d 8, 13 (2d Cir.), cert. denied, 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964); *United States v. Pacente*, 503 F.2d 543 (7th Cir.), cert. denied, 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 642 (1974). See also *United States v. Rodriguez*, 545 F.2d 829 (2d Cir. 1976), cert. denied, 434 U.S. 819, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977); *United States v. Diggs*, 173 U.S.App.D.C. 95, 522 F.2d 1310 (1975), cert. denied, *Floyd v. U. S.*, 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1977); *United States v. Maxwell*, 383 F.2d 437, 443 (2d Cir. 1967), cert. denied, 389 U.S. 1057, 88 S.Ct. 809, 19 L.Ed.2d 856 (1968); *United States v. Woodner*, 317 F.2d 649 (2d Cir.), cert. denied, 375 U.S. 903, 84 S.Ct. 192, 11 L.Ed.2d 144 (1963).

In these circumstances, with all deference to distinguished counsel, it may be that this bare assertion of fatal error at this time in this civil case by this party is unlikely to be remembered as an ornament in the judicial process.

Defendant's motions are in all respect denied.

It is so ordered.